KAUTZ, Justice.
[¶ 1] A jury found Robert C. Swett guilty of aggravated child abuse. He claims the district court erred by allowing the State to present testimony about an altercation he had in jail while awaiting trial in this case. We conclude the district court abused its discretion by admitting the evidence; however, Mr. Swett was not prejudiced by the error. Consequently, we affirm.
ISSUE
[¶ 2] Mr. Swett presents the following issue on appeal:
Did the trial court abuse its discretion by admitting evidence of subsequent bad acts contrary to W.R.E. 404(b) and irrelevant [evidence], contrary to W.R.E. 401 ?
FACTS
[¶ 3] On July 16, 2016, Kimberly Wegener (Kimberly) gave birth to a healthy baby boy (hereinafter referred to as "the Child"). Mr. Swett was the Child's father. The Child had difficulty gaining weight and, in September 2016, was hospitalized for failure to thrive. During his two-day hospital stay, the Child gained 12 ounces. This led his pediatrician to conclude the parents simply were not feeding the Child enough. The pediatrician, the nurses at the hospital, and a public health nurse worked with the parents to develop strategies to help the Child gain weight. The parents were taught how to hold the Child during feedings, the frequency with which he should be fed, and the amount he should be fed at each feeding. The parents were concerned about the Child spitting up but, although he had a minor reflux issue, the healthcare providers did not see it as an impediment to weight gain. Throughout the fall and winter of 2016, the Child was seen frequently for weight checks. The public health nurse even came to the family's home to help them with feeding issues. Despite *1139 those efforts, as of January 2017, the Child's weight was below the first percentile on the growth curve.
[¶ 4] On January 13, 2017, Mr. Swett and Barbara Wegener (the Child's grandmother and Kimberly's mother) took the Child to the pediatrician's office. The Child had been vomiting, and he was cold, pale, and not as alert as normal. The Child had bruising on his forehead and redness and scratches on the top of his head. Mr. Swett told the nurse he had dropped the Child in the bathtub the night before, while rinsing him off after a vomiting incident. The pediatrician ordered a CT scan of the Child's head, which revealed a skull fracture and subdural hematoma.
[¶ 5] Law enforcement was notified about the Child's injuries, and Sheridan Police Department Detective Daniel Keller went to the hospital to interview Mr. Swett and Kimberly. Mr. Swett told him that, the previous night, he was watching the Child while Kimberly slept. Mr. Swett said the Child had a history of vomiting and, after his 8:00 p.m. feeding, he "immediately threw up," "like a volcano or a fountain, just going all over." Mr. Swett took the Child to the bathroom and washed him off by holding him under the shower. He said he was holding the Child in his left arm "in a cradling fashion" with the shower running and he used his right arm to "reach over to a cabinet above the sink ... and get some soap, and then wash the child over the tub." Mr. Swett then
described a series of quick events where essentially the child made some sort of turn and slipped from his arms into the tub. He described the child hitting face first in the tub. He described having a difficult time getting control of the child as the child was wet and slippery. He described the child, as he was trying to get control, essentially hitting his head on the side of the tub again or the drain and again falling on his butt before he gained control of him.
Mr. Swett told the detective that he took the Child to the living room and noticed red marks on his forehead. The Child cried for about five minutes before Mr. Swett was able to calm him and put him to sleep. Mr. Swett said that, when he woke the Child the next morning to feed him, he noticed the red marks had turned dark purple.
[¶ 6] The Child's injuries were serious, so he was life-flighted to Children's Hospital in Denver, Colorado, and Mr. Swett accompanied him. The Child stayed at Children's Hospital for several days, during which time he underwent numerous tests and his condition was monitored. A child protection team (CPT) became involved in the case to determine whether the Child's injuries were the result of accidental or non-accidental (abusive) trauma. After speaking with Mr. Swett, observing his behavior, and reviewing the results of various tests, the CPT determined the Child's injuries were the result of child abuse and took him into protective custody.
[¶ 7] The State charged Mr. Swett with felony child abuse and later amended the charge to aggravated child abuse, under Wyo. Stat. Ann. § 6-2-503 (LexisNexis 2017) :
(b) A person is guilty of child abuse, a felony punishable by imprisonment for not more than ten (10) years, if a person responsible for a child's welfare as defined in W.S. 14-3-202(a)(i) intentionally or recklessly inflicts upon a child under the age of eighteen (18) years:
(i) Physical injury as defined in W.S. 14-3-202(a)(ii)(B), excluding reasonable corporal punishment[.]
....
(c) Aggravated child abuse is a felony punishable by imprisonment for not more than twenty-five (25) years if in the course of committing the crime of child abuse, as defined in subsection (a) or (b) of this section, the person intentionally or recklessly inflicts serious bodily injury upon the victim[.]
[¶ 8] Pursuant to Wyoming Rule of Evidence 404(b), Mr. Swett filed a demand for disclosure of other crimes, wrongs, or acts the State intended to use as evidence at trial. The State gave notice that it intended to use evidence of Mr. Swett's acts of violence toward two former significant others and the children they shared with Mr. Swett, and a violent act he committed while in jail on the child abuse charge. The district court refused to allow testimony from Mr. Swett's former *1140 significant others but allowed testimony regarding the jail incident to show intent, lack of accident, and motive.
[¶ 9] The case went to trial before a jury in September 2017. During the four-day trial, the State presented fifteen witnesses, including Kimberly, Barbara Wegener, the nurse who saw the Child at the pediatrician's office on January 13, 2017, the Sheridan Memorial Hospital radiologist who read the Child's CT scan, two nurses from the Sheridan hospital, the Child's pediatrician, a nurse from Children's Hospital, two social workers from Children's Hospital, Detective Keller, an expert pediatrician with specialized training in child abuse from Children's Hospital, and three witnesses regarding the jail incident.
[¶ 10] The defense presented three witnesses, including the public health nurse who helped Mr. Swett and Kimberly with the Child's feeding and weight issues, an expert neurologist, and Mr. Swett. The district court instructed the jury that, in order to convict Mr. Swett of aggravated child abuse, it had to find that he intentionally inflicted serious bodily injury upon the Child, in addition to the other elements of the charge. The district court also instructed the jury on Mr. Swett's theory of defense: "It is the Defendant's theory of defense that the injuries to [the Child] were the result of unintentional acts." The jury returned a verdict of guilty. The district court sentenced Mr. Swett to 18 to 23 years in prison, and Mr. Swett filed a timely notice of appeal. More facts will be provided as necessary to our discussion of the issue on appeal.
STANDARD OF REVIEW
[¶ 11] By filing a pre-trial demand for notice of other bad acts evidence, Mr. Swett preserved his claim that the district court erred by admitting the evidence at trial. See Garrison v. State, 2018 WY 9, ¶ 12, 409 P.3d 1209, 1213 (Wyo. 2018). When an issue regarding the admissibility of evidence is presented to the district court, we review its decision for abuse of discretion. Triplett v. State, 2017 WY 148, ¶ 23, 406 P.3d 1257, 1262 (Wyo. 2017) ; Garland v. State, 2017 WY 102, ¶ 24, 401 P.3d 480, 487 (Wyo. 2017).
A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal. The appellant bears the burden of showing an abuse of discretion.
In re GAC, 2017 WY 65, ¶ 32, 396 P.3d 411, 419 (Wyo. 2017) (quoting Wise v. Ludlow, 2015 WY 43, ¶ 42, 346 P.3d 1, 12 (Wyo. 2015) ) (other citations omitted).
[¶ 12] If we find the district court erred by admitting the evidence, we must then determine whether the error was prejudicial, requiring reversal, or whether the error was harmless. Foster v. State, 2010 WY 8, ¶ 4, 224 P.3d 1, 4 (Wyo. 2010) ; W.R.Cr.P. 52. An error is deemed prejudicial when there is a reasonable probability that, in the absence of the improper evidence, the verdict would have been more favorable to the appellant. Bustos v. State, 2008 WY 37, ¶ 9, 180 P.3d 904, 907 (Wyo. 2008) (citing Burton v. State, 2002 WY 71, ¶ 12, 46 P.3d 309, 313 (Wyo. 2002) ).
DISCUSSION
A. Rule 404(b)
[¶ 13] Mr. Swett claims the district court abused its discretion when it admitted evidence of the jail incident under Rule 404(b), which states:
(b) Other crimes, wrongs, or acts .-Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.
[¶ 14] Our Rule 404(b) jurisprudence requires four elements be satisfied before *1141 other bad acts may be admitted into evidence at trial:
(1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted. Vigil [v. State ], 926 P.2d [351], 357 [ (Wyo.1996) ] (quoting United States v. Herndon, 982 F.2d 1411, 1414 (10th Cir.1992) ).
Gleason v. State, 2002 WY 161, ¶ 18, 57 P.3d 332, 340 (Wyo. 2002) ; Griggs v. State, 2016 WY 16, ¶ 128, 367 P.3d 1108, 1143 (Wyo. 2016).
[¶ 15] The State gave notice that it intended to use evidence of Mr. Swett's other misconduct to show his motive, intent, and absence of mistake or accident. The misconduct included Mr. Swett's prior violent behavior towards two former significant others and his other children and a violent incident he committed while in jail awaiting trial in this case.
[¶ 16] The State described the jail incident, as follows:
On May 23, 2017[,] the Defendant was in a physical altercation at the Sheridan County Detention Center. The victim told law enforcement that the Defendant grabbed him by the throat, forced him into the shower room, and threw him to the ground. The Defendant denied being in a fight with the victim, and said that the victim fell on his own. For full law enforcement narrative see attached "Exhibit E."
[¶ 17] The State also filed a memorandum and caselaw advocating for admission of the 404(b) evidence. In this second filing, the State omitted motive from the list of purposes for which it was offering the evidence. The district court held a hearing on the 404(b) issue on August 22, 2017. The State's argument focused on admission of the evidence to show Mr. Swett's intent and lack of mistake or accident. It did not explain how the evidence would prove Mr. Swett's motive or the relevance of his motive to the case.
[¶ 18] Specifically addressing the detention center incident, the State argued:
Interestingly enough, the incident at the Sheridan County Detention Center had to do with-which the defendant pled no contest to, initially the defendant told law enforcement officers or detention staff that the victim's injuries were due to an accidental fall in the shower. That, again, is highly relevant. It bears on his intent. It's very similar to what he suggested happened here to [the Child], that it was just an accident, that the baby was dropped in the bathtub.
[¶ 19] The district court forbade the State from using the evidence of Mr. Swett's violence toward his significant others and children, finding the danger of unfair prejudice substantially outweighed the evidence's probative value. However, the district court allowed the evidence of Mr. Swett's attack on a fellow inmate for the purposes of establishing intent, absence of mistake or accident, and motive. The court said the evidence was relevant "in that it establishes Defendant's explanation that an accident occurred in order to diminish his culpability." The district court gave the jury a limiting instruction prior to the testimony about the jail incident.
[¶ 20] The State called three witnesses to testify about the jail incident-the inmate who was the victim in the altercation, another inmate who witnessed the altercation, and a detention officer. The victim testified that he and Mr. Swett exchanged words about how the victim was brushing his teeth. He said Mr. Swett
grabbed me by the arm and threw me across the [cell] block to the back of the block and then shoved me into the shower room where he proceeded to shove me around. And then he grabbed me by my neck and pushed me down and then he pushed me against the shower-or against the closet door, when I got back up, and was banging my head against the door.
The victim testified Mr. Swett threatened to "crush" his "skull," but admitted on cross-examination that he did not include the information about Mr. Swett's threat in the written statement he provided the day of the altercation. The victim said he had some *1142 minor cuts in his mouth and a couple of scrapes and marks on his face from the altercation.
[¶ 21] The inmate who witnessed the incident testified consistent with the victim's testimony, including Mr. Swett's threat to crush the victim's skull. Like the victim, the witness admitted on cross-examination that he had not included Mr. Swett's threat in his written statement about the incident. The detention officer testified about his investigation of the incident. He did not mention that either the victim or the witness had stated Mr. Swett threatened to crush the victim's skull. Instead, his testimony focused on how Mr. Swett explained the incident. He said Mr. Swett initially denied the altercation, then said the inmate victim "instigated" the altercation and "insinuated" the inmate was hurt accidentally when he pushed Mr. Swett.
[¶ 22] Before we discuss the specific bases for which the district court admitted the jail incident, we will address the timing of the two incidents. Evidence admitted under Rule 404(b) is often referred to as prior bad acts evidence because, in many cases, the other crime, wrong or act occurred before the charged crime. See, e.g., Griggs , ¶ 131, 367 P.3d at 1144; McGinn v. State , 2015 WY 140, 361 P.3d 295 (Wyo. 2015). Here, though, the jail incident took place after the child abuse. The fact that the other misconduct happened after the charged crime does not affect its admissibility under Rule 404(b). The rule, itself, refers to "other" acts, rather than "prior" acts. We applied the rule in Garrison, ¶ 33, 409 P.3d at 1218-19, and affirmed the district court's decision allowing into evidence acts committed by Garrison after the charged act.
[¶ 23] The first three elements of the Gleason test are related because, to be admissible, the evidence must be offered for a proper purpose and be relevant and probative to a material issue in the case. Gleason, ¶ 18, 57 P.3d at 340. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. As we said in Gleason, ¶ 17, 57 P.3d at 339, Rule 404(b) allows "evidence of specific instances of conduct to prove 'consequential facts' such as intent[.]" In Grabill v. State, 621 P.2d 802, 809 (Wyo. 1980), we explained that
" Rule 404(b) is a specialized rule of relevancy. Accordingly, as with any determination pursuant to Rule 401, counsel must be prepared to 1) identify the consequential fact to which the proffered evidence of other crimes, wrongs or acts is directed, 2) prove the other crimes, wrongs or acts, and 3) articulate precisely the evidential hypothesis by which the consequential fact may be inferred from the proffered evidence.
(quoting 2 Weinstein's Evidence, § 404(08) ). Evidence is not relevant and admissible under Rule 404(b)"if the thrust of the evidence is only to demonstrate that the defendant has a disposition to commit crimes." Gleason, ¶ 17, 57 P.3d at 340.
[¶ 24] The State claimed Mr. Swett intentionally inflicted serious bodily injury upon the Child. Mr. Swett admitted he injured the Child but claimed he did so accidentally. The district court allowed the jail incident evidence to show intent and lack of accident, which were disputed issues. The concepts of intent and lack of accident are related. "[I]ntent in criminal cases is often an element of the charged crime." Goodman v. State, 601 P.2d 178, 181-82 (Wyo. 1979). It may encompass "both the desire to achieve a particular end and the knowledge that such an end is the almost-certain result of an act." Id. at 182. Of course, intent may have "more specific meanings, depending upon the context and the definition of the crime charged." Id. Lack of accident is a "subcategory" of intent, "since the defense of ... accident is ... based on the absence of criminal intent." R. Park & A. Orenstein, Trial Objections Handbook 2d § 2:25 (Updated 2018). See also , 22B Fed. Prac. & Proc. Evid. § 5255 (2d. ed. Updated 2018) (lack of accident is "a more specialized application of the broader category of 'intent' "). We have said that "[i]ntent is sometimes loosely defined as 'merely the absence of accident.' " Grabill, 621 P.2d at 810 (quoting Goodman, 601 P.2d at 181 ).
*1143 [¶ 25] The use of a defendant's other misconduct to prove lack of accident is premised upon Wigmore's theory of improbability. 1 E. Imwinkelried, Uncharged Misconduct Evidence § 5:11 (Updated 2017) (citing 2 Wigmore, Evidence § 363 (3rd ed.) ). See also , 22B Fed. Prac. & Proc. Evid. § 5255. Under the theory of improbability, which is also known as the doctrine of chances, "the credibility of the accident explanation decreases as the number of instances of similar conduct increases." Imwinkelried § 5:11. Stated another way, "the more often an accidental or unusual event occurs, the more likely it is that any subsequent reoccurrence is not the result of a mistake or accident." R. Larsen, Navigating a Federal Trial § 10:53. In Goodman, 601 P.2d at 182, we quoted 2 D. Louisell and C. Mueller, Federal Evidence, § 140, pp. 126-28 (1985), as follows:
Other acts by the accused, including other crimes, may be received to prove intent on the common-sense theory that the more often a person acts in a particular way and achieves a particular result, the more likely it is that he intended the result.
See also , Pena v. State, 780 P.2d 316, 321 (Wyo. 1989). In Wimbley v. State, 2009 WY 72, ¶ 16, 208 P.3d 608, 612 (Wyo. 2009), we illustrated the doctrine of chances by quoting 2 John H. Wigmore, Evidence § 302, at 241 (Chadbourne rev. 1979), as follows: " '[T]he chances of an inadvertent shooting on three successive similar occasions are extremely small.' "
[¶ 26] Other bad acts evidence is frequently used in child abuse cases to show that the defendant acted intentionally and the injuries to the child did not occur by accident. See, e.g. , Grabill, 621 P.2d at 806-10 (evidence of the defendant's physical abuse of his other children admissible to show intent); State v. Hassett, 124 Idaho 357, 859 P.2d 955, 959-61 (Idaho Ct. App.1993) (evidence of prior abuse of another child admissible to show the defendant "willfully" inflicted physical abuse upon the child in the charged offense); 29 Am. Jur. 2d Evidence § 451 (Updated 2018) (admission of other bad acts "such as the defendant's abuse of other children, or previous abuse of the same child, to show the absence of mistake or accident in the instant case"). See also , Vigil v. State, 2010 WY 15, 224 P.3d 31 (Wyo. 2010) (evidence of defendant's prior sexual abuse of a minor relevant to prove the defendant acted with sexual intent and did not touch the victim's genitals accidentally while performing a massage).
[¶ 27] However, in order to be relevant to the issue of intent and counter a defense of accident, the other bad act must be similar to the charged crime. Goodman, 601 P.2d at 182. See generally , Hart v. State, 2002 WY 163, ¶ 15, 57 P.3d 348, 354 (Wyo. 2002) (emphasizing the similarity of the uncharged misconduct to the charged crime). In Wimbley, ¶ 16, 208 P.3d at 612, we explained that "when intent is at issue, evidence of several similar, prior acts may be admissible."
[¶ 28] In child abuse cases, this generally requires a showing that the victim(s) in both instances were the same person or similar in nature and/or the circumstances were similar. See, e.g ., 29 Am. Jur. 2d Evidence § 451. The similarities of the acts are what make accidental repetition unlikely. For example, in People v. Magyar, 250 Mich.App. 408, 648 N.W.2d 215 (2002), the defendant was convicted of felony murder during the perpetration of child abuse. The court of appeals upheld the admission of evidence, under Michigan Rule of Evidence 404(b), of the defendant's prior abuse of another child because it was relevant to show his intent and lack of accident. Id. at 218-19. The defendant had asserted that both children, who were near the same age, were hurt accidentally. Although the defendant's prior misconduct involved a different child, the court held that "[t]he multitude of similarities between the incidents support the prosecution theory that [the deceased victim's] injuries did not result from an accident." Id. at 219.
[¶ 29] Similarly, in Branstetter v. State, 346 Ark. 62, 57 S.W.3d 105, 109-10 (2001), the defendant claimed the child died of an accidental fall down the stairs. The Arkansas Supreme Court upheld the admission of evidence of the defendant's prior abuse of the victim and his sister. Id. at 107, 112-13. As with the fatal injury, Branstetter claimed the prior injuries to the victim and his sister *1144 were accidental. Id. The court explained that evidence of the prior abuse
had a tendency to make it more probable the [fatal] injuries were not the result of an accident or mistake and, thus, the evidence was relevant under Ark. R. Evid. 401. It also bears on intent. The evidence was not offered to show the bad character of Branstetter in an attempt to give the jury reason to believe that Branstetter is the type of person who would commit such an act, but rather was offered to show intent and lack of mistake or accident in the presently charged crime. The evidence is independently relevant proof of Branstetter's intent and the absence of mistake or accident in committing the offense. The evidence is admissible under the intent and absence-of-mistake-or-accident exception to Ark. R. Evid. 404(b).
Id. at 113. Looking at the holding under the doctrine of chances, the defendant's repeated abuse of the same victim and a similar victim (the deceased's sister) made it less likely the fatal injury was an accident. See also , United States v. Harris, 661 F.2d 138, 142-43 (10th Cir. 1981) (prior acts of violence against the same infant showed that the injuries in the charged crimes were not accidental and the defendant acted intentionally when he killed the child).
[¶ 30] When the other bad acts evidence involves an act of violence that is not similar to the charged crime, the other bad acts evidence does nothing more than show the defendant has a propensity for violence. Admission of other bad acts evidence under those circumstances violates Rule 404(b) because it allows the jury to make an improper inference that the defendant is guilty of the charged act of violence because he acted in conformity with his violent character. The Tenth Circuit addressed such a situation in United States v. Hogue, 827 F.2d 660 (10th Cir. 1987). Although Hogue is not a child abuse case, it provides a good explanation of why the other bad act must be similar to the charged crime in order to be admissible under Rule 404(b) to prove intent and lack of accident.
[¶ 31] Hogue was convicted of voluntary manslaughter for the fatal stabbing of a man during a fight. Id. at 661-62. At trial, he claimed he accidentally stabbed the victim. Id. at 663. The trial court allowed the government to present evidence that the defendant had beaten his girlfriend and her children to show he did not accidentally stab the victim. Id. at 662-63. The Tenth Circuit held that the trial court "failed to draw a clear and logical connection between the 'other acts' evidence and the case being tried that would justify admission of the evidence." Id. at 663. The court said, "[t]here was no way that the absence of an accident can be inferred from the evidence of Mr. Hogue's assaults" on his girlfriend and her children. Id . Because there was no rational relationship between the victims and/or the assaults, the other misconduct was impermissible evidence of the defendant's propensity for violence. Id. Without a showing of sufficient similarity between the charged crime and the defendant's other misconduct, the other bad acts evidence demonstrates only that the defendant has a violent disposition and acted in accordance with it when committing the charged crime, which violates Rule 404. See id. See also , State v. Jolley, 656 N.W.2d 305, 308-09 (S.D. 2003) (insufficient similarity between the other bad acts evidence of abusive adult relationships and the charged crime of "a small child being beaten to death").
[¶ 32] In the case at bar, the district court allowed the State to present evidence that Mr. Swett fought with another inmate while he was in jail awaiting trial in this case and then claimed it was an accident. The court said the evidence of the jail incident was relevant to the child abuse prosecution "in that it establishes Defendant's explanation that an accident occurred in order to diminish his culpability." Under the principles discussed above, for evidence of Mr. Swett's other misconduct to be admissible to prove intent or lack of accident, it must be similar to the charged crime. Obviously, the victims in the two crimes were very different-the victim in the jail incident was an adult and the victim in the charged child abuse was Mr. Swett's five-month-old son. The settings were also different-the jail incident happened in the context of Mr. Swett's incarceration, while the injuries to the Child occurred at *1145 home. Interestingly, the district court noted the lack of similarity between the two incidents when it found the jail incident evidence admissible: "[T]here is little similarity between the incidents other than the use of accident as an explanation for violence."
[¶ 33] The district court's ruling that the jail incident was admissible was based on what it perceived to be Mr. Swett's similar reaction to each incident, i.e., his attempt to excuse his actions by claiming the victims were hurt accidentally, without any intent on his part.[1] We do not agree that this common feature was enough to make the jail incident relevant in the child abuse prosecution.
[¶ 34] The only testimony regarding Mr. Swett's claim that the other inmate was hurt accidentally was from the detention officer:
Q. Okay. I want to focus you just to what the defendant told you.
What did he tell you had happened that day?
....
THE WITNESS: Okay. He stated that [the victim inmate] had spit on him and then that the two proceeded to the shower area and that [the victim] pushed Mr. Swett and then fell to the ground and sustained injuries to his face and neck as a result of the fall.
Q. How did the defendant characterize what happened to [the victim]?
A. He insinuated that it was like an accident.
Q. And he maintained [the victim] was the one who instigated the fight?
A. Yes. Initially, he denied the altercation.
[¶ 35] Mr. Swett's excuse for the injuries to the inmate was different from his excuse for the injuries to the Child. Mr. Swett said the victim "instigated" the altercation and "insinuated" the inmate was hurt accidentally when he pushed Mr. Swett, lost his balance and fell. Essentially, Mr. Swett claimed he had no part in causing the victim's injuries. In contrast, Mr. Swett admitted he injured the Child by dropping him, but claimed he did so inadvertently. 1 E. Imwinkelried, Uncharged Misconduct Evidence § 5:11 explains there is a difference between an accident where the defendant admits the actus reus (dropping the baby) but claims he did so inadvertently (not intentionally) and an accident where the defendant claims not to have committed the actus reus (the victim inmate fell without the defendant touching him).
[¶ 36] The jail incident was not sufficiently similar to the charged child abuse to make it relevant to Mr. Swett's intent or whether the Child's injuries were the result of an accident. The incidents involved different victims who were not similar in any way, the settings of the incidents were entirely different, and the claimed accidents were not the same type. The district court abused its discretion by admitting the evidence of the jail incident under Rule 404(b) to show Mr. Swett's intent and lack of accident.
[¶ 37] The district court also admitted the jail incident to show Mr. Swett's motive. The exact motive the evidence was supposed to demonstrate was not identified by the district court. Although the State listed "motive" as one of the purposes for which it was proposing admission of the jail incident in its initial notice, it did not list motive as a purpose in its memorandum. Furthermore, the State did not argue motive as a proper purpose for the evidence at the hearing. Even on appeal, the State does not specify the purported motive which the jail incident would demonstrate. In its appellate brief, the State argues that if the Child's "injuries were not accidental, then they must have been caused intentionally and were the product of some kind of motivation." (Emphasis added.)
[¶ 38] As we stated above, in order to establish the admissibility of other bad acts evidence under Rule 404(b), the proponent must "identify the consequential fact to which the proffered evidence of other crimes, wrongs or acts is directed" and "articulate precisely the evidential hypothesis by which the consequential fact may be inferred from the proffered evidence." Grabill, 621 P.2d at 809 (quoting 2 Weinstein's Evidence, § 404(08) ). Similarly, we stated in *1146 Hart, ¶ 16, 57 P.3d at 355, the "relevance and probativeness cannot be determined without knowing what it is the evidence is meant to prove."
[¶ 39] In Brown v. State, 736 P.2d 1110, 1112-13 (Wyo. 1987) (superseded by statute on other grounds, 1987 Wyo. Sess. Laws ch. 157, § 3, as recognized in Jones v. State, 771 P.2d 368, 370 (Wyo. 1989) ), we said that motive is different than intent.
" * * * Motive is generally defined as that which leads or tempts the mind to indulge in a particular act. 21 Am.Jur.2d Crim.Law § 85, p. 166 ; Black's Law Dictionary (Rev. 4th ed.). It is distinguishable from intent, which is the purpose to use a particular means to effect a ... result. People v. Molineux, 168 N.Y. 264, 61 N.E. 286, 62 L.R.A. 193 (1901). * * * "
Brown, 736 P.2d at 1112-13 (quoting State v. Stevens, 93 Idaho 48, 454 P.2d 945, 950 (1969) ). Motive may often be "an emotion that would provoke or lead to the commission of a criminal offense." Id. at 1113 (quoting Rodriguez v. State, 486 S.W.2d 355, 358 (Tex. Ct. App. 1972) ).
[¶ 40] An example of the proper use of "motive" evidence is found in child sexual abuse cases. In Elliott v. State, 600 P.2d 1044, 1048-49 (Wyo. 1979), evidence that the defendant had previously attempted to sexually abuse the victim's older sister demonstrated the defendant had motive to sexually abuse the victim because of his "preference or addiction for unusual sexual practices ... in the form of pedophilia." "This Court has consistently held that 'sexual behavior with a defendant's minor children, adopted children, or step-children is unusual sexual behavior permitting admission of uncharged misconduct evidence to prove motive when the accused denies that the charged conduct ever occurred.' " McDowell v. State, 2014 WY 21, ¶ 28, 318 P.3d 352, 361 (Wyo. 2014) (quoting Brower v. State, 1 P.3d 1210, 1214 (Wyo. 2000) ). See also , Gleason, ¶ 19, 57 P.3d at 340-341 (collecting cases). Given the State did not clearly explain what motive it was attempting to show with the evidence of the jail incident and it made no effort to distinguish motive from intent, the district court abused its discretion by admitting the evidence to show Mr. Swett's motive.
[¶ 41] Based upon the State's arguments regarding intent and lack of accident, we might surmise that it was attempting to show Mr. Swett was motivated by anger or frustration. If that is the case, the evidence suffers from the same deficiencies associated with using it to show his intent. First, there are insufficient similarities between the jail incident and the charged child abuse to demonstrate Mr. Swett's motive. See generally , People v. Deeney, 145 Cal.App.3d 647, 193 Cal.Rptr. 608, 612 (1983) (evidence that defendant had previously dragged his wife through a grassy area and sprayed her with water did not demonstrate that he had a motive to kill her). The fact that Mr. Swett acted in anger or frustration against a fellow adult inmate while in jail does not show he acted in anger or frustration against his infant son while caring for him at home. Consequently, the effect of the evidence of the jail incident was simply to show that Mr. Swett had a propensity for violence and acted in conformity therewith when he injured the Child, which violates Rule 404(b).
B. Prejudice
[¶ 42] Given we have determined the district court erred by admitting the jail incident evidence, we must determine whether the error was prejudicial, requiring reversal of his conviction, or whether the error was harmless. Foster , ¶ 4, 224 P.3d at 4 ; W.R.Cr.P. 52. An error is prejudicial if there is a reasonable probability that the verdict would have been more favorable to the appellant had the error not occurred. Bustos, ¶ 9, 180 P.3d at 907 ; Burton, ¶ 12, 46 P.3d at 313. Under Wyoming law, the appellant has the burden of showing prejudice when we determine the district court abused its discretion by admitting evidence at trial. See, e.g ., Garner v. State, 2011 WY 156, ¶ 9, 264 P.3d 811, 816-17 (Wyo. 2011).
[¶ 43] Initially, Mr. Swett argues he was prejudiced because the jury learned, through the detention officer's testimony, that he was in jail at the time of the trial. In response to a question from the prosecutor about how he knew the defendant, the detention *1147 officer testified, "He's an inmate at the county jail." The defense objected, and the district court sustained the objection, struck the answer from the record, and directed the jury to disregard it. The defense then moved for a mistrial, and the district court denied the motion. The court said Mr. Swett was not prejudiced because there was no undue emphasis of the fact he was in jail and the it had sustained the objection and struck the statement. Mr. Swett does not claim the district court erred by denying his motion for a mistrial.
[¶ 44] We addressed a similar situation in Foster, ¶ 25, 224 P.3d at 11-12, where an officer testified that Foster was currently an inmate in the jail. We concluded the district court did not abuse its discretion by allowing the officer's testimony because it was necessary for the State to establish how the officer knew Foster to provide foundation for his later testimony regarding Foster's handwriting. We also stated Foster had failed to establish he was unfairly prejudiced by the testimony because, given Foster was charged with eleven drug crimes, "[s]urely, it was not a big surprise to the jury to find that [he] had been in jail as a result." Id.
[¶ 45] The same principles apply here. The State asked the detention officer how he knew Mr. Swett to lay foundation for his later testimony about the jail incident. The prosecutor told the district court she expected the officer would testify that Mr. Swett was incarcerated at the time of the jail incident. In any event, the jury would not have been surprised to learn, given the serious charge against Mr. Swett, that he was in jail at the time of trial.
[¶ 46] The district court reduced any potential prejudice from the improper evidence by sustaining the defense's objection and directing the jury to disregard the officer's statement. The jury was instructed it "must disregard entirely" any evidence ordered stricken by the district court. We presume the jurors follow the district court's instructions. See Willoughby v. State, 2011 WY 92, ¶ 50, 253 P.3d 157, 174 (Wyo. 2011). Mr. Swett has not established he was prejudiced when the jury learned he was incarcerated at the time of trial.
[¶ 47] We now consider the prejudicial impact of the improper admission of the jail incident under Rule 404(b). As we discussed above, there was little similarity between the jail incident and the charged child abuse. The jury certainly could understand the difference between a fight between two adult males while incarcerated, which resulted in insignificant injuries, and a life-threatening injury to one's own five-month-old son while caring for him at home. The lack of relevance of the evidence reduces its prejudicial impact. One of the factors we identified in Gleason, ¶ 27, 57 P.3d at 342, for evaluating the danger of unfair prejudice from 404(b) evidence is the similarity of the other bad act to the charged crime. We stated, "The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again." Id. Also, although three witnesses testified about the jail incident, their testimony was very brief, taking up only sixteen pages of a 670-page trial transcript. The prosecutor did not mention the jail incident in her opening statement or closing argument.
[¶ 48] Arguably, the most damaging part of the jail incident was the testimony about Mr. Swett's threat to crush the victim inmate's skull. However, Mr. Swett does not even mention that aspect of the testimony in his brief on appeal. Furthermore, defense counsel effectively cross-examined both inmates and secured their admissions that they had not mentioned Mr. Swett's threat to crush the victim inmate's skull in their written reports of the incident. Consistent with the omission of that information from their reports, the detention officer did not testify about any such statement. Given Mr. Swett does not address this aspect of the jail incident evidence, we will not consider it further.
[¶ 49] The district court instructed the jury that the purposes for which the jail evidence was admitted were limited:
Ladies and gentlemen of the jury, the next three witnesses you hear from are going to be witnesses that are going to provide evidence for a limited purpose, and *1148 I'm going to read to you an instruction with respect to that limited purpose.
If you find that the defendant committed another physical act in the past, this is not evidence that he may have committed such an act in this case. You may not convict a person simply because you believe he committed similar acts in the past. The defendant is on trial only for the crime charged and you may consider the evidence of other acts only on the issue(s) of intent, motive, and absence of mistake in fact or accident.
So the evidence you receive from the next three witnesses will be limited consistent with this instruction I provided to you.
[¶ 50] The district court erred by admitting the evidence to show Mr. Swett's intent, motive and lack of accident; consequently, the limiting instruction addressing those purposes was also erroneous. However, the limiting instruction also informed the jury that the jail incident was not evidence that he committed the child abuse and it could not convict Mr. Swett of child abuse simply because he committed the jail incident. Those aspects of the instruction limited the prejudicial impact of the erroneous evidentiary ruling.
[¶ 51] Mr. Swett makes a sweeping argument that limiting instructions are essentially useless, citing a concurring opinion from a 1949 United States Supreme Court case and a law review article. In Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J. concurring), Justice Jackson stated: "The naive assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction." (Citations omitted.) In a University of Pittsburgh Law Review article, the author discussed, in a footnote, studies and articles which indicate that limiting instructions are ineffective. J. Ross, "He Looks Guilty": Reforming Good Character Evidence to Undercut the Presumption of Guilt, 65 U. Pitt. L. Rev. 227, 251 n. 105 (2004).
[¶ 52] As we stated above, this Court presumes juries follow limiting instructions. See, e.g. , Sullivan v. State, 2011 WY 46, ¶ 15, 247 P.3d 879, 883 (Wyo. 2011). Under the doctrine of stare decisis , we depart from precedent "only upon due reflection and only if we are convinced that it is necessary to 'vindicate plain, obvious principles of law and remedy continued injustice.' " McGinn , ¶ 28, 361 P.3d at 301 (quoting Borns v. Voss, 2003 WY 74, ¶ 26, 70 P.3d 262, 271 (Wyo. 2003) ). Mr. Swett's very brief argument has failed to convince us that departure from our precedent regarding limiting instructions is warranted.
[¶ 53] Mr. Swett suggests this Court blindly holds that limiting instructions cure prejudice in all cases. That is not true. A limiting instruction is one factor we consider in determining whether there is a reasonable probability that the verdict would have been different if the erroneous evidence had not been admitted at trial. See, e.g ., Doherty v. State, 2006 WY 39, ¶¶ 26-28, 131 P.3d 963, 971-72 (Wyo. 2006) (considering a limiting instruction and the significance of the improper evidence in the prejudice analysis). In point of fact, we are not relying solely upon the limiting instruction in determining whether Mr. Swett was prejudiced by the admission of the improper 404(b) evidence in this case. Instead, we will analyze the relative significance of the improper testimony to the verdict by reviewing the other evidence in the case.
[¶ 54] If the jail incident were the only evidence the State provided to show lack of accident, this would be a much closer case. However, the State presented other, very convincing, evidence that the Child's injuries did not result from an accidental fall. Considering all the trial evidence, there is no reasonable probability the jury would have concluded the Child's injuries were the result of an accidental fall had the evidence of the jail incident been excluded.
[¶ 55] Dr. Curtis Ford, a pediatrician who is board certified in child abuse pediatrics and has an impressive list of accomplishments in the field of diagnosing child abuse (including abusive head trauma ), treated the Child at Children's Hospital. He testified at length about the Child's injuries, which included a fractured skull, subdural hematoma, and severe retinal hemorrhaging. The Child *1149 later developed seizures which Dr. Ford and pediatric neurologists at Children's Hospital attributed to the head trauma. Dr. Ford said that a fall from a height of three to four feet, which was the greatest distance Mr. Swett said the Child fell, would not have resulted in those injuries, particularly the retinal hemorrhaging. Dr. Ford testified the types of actions that would cause the Child's injuries would include being thrown into a hard object like a bathtub or being shaken. He had earlier testified that abusive head trauma can include a combination of shaking and an impact injury. After considering the Child's history, the test results, and the physical assessment, Dr. Ford concluded the Child's "constellation of injuries" was consistent with abusive head trauma.
[¶ 56] The defense expert, Dr. James Richards, a neurologist at St. Vincent's Healthcare in Billings, Montana, had very little recent experience with children and no experience with child abuse. He had never met or examined the Child, and his opinion that the injuries to the Child could have been caused accidentally was based upon his review of the medical records. Although Dr. Richards initially stated that the Child's skull fracture was small, after being shown x-rays he had not seen before, he conceded it was a more substantial fracture than he originally thought. Dr. Richards' opinion summary did not even refer to the retinal hemorrhaging, which was such an important part of Dr. Ford's diagnosis of abusive head trauma. When Dr. Richards was confronted with several articles about the close link between severe retinal hemorrhaging and abusive head trauma, he stated that he had no reason to dispute their conclusions.
[¶ 57] The trial evidence also showed that Mr. Swett lacked empathy for the Child and did not interact with the Child or attempt to comfort him. The nurse at the pediatrician's office testified Mr. Swett left the Child lying on the exam table by himself and without a blanket, while he sat in a chair. She also overheard him on the phone, presumably talking to Kimberly. He said, "Of course they asked about the bruise first." One of the nurses at the Sheridan hospital said that, when Mr. Swett was told the Child needed to be flown to Children's Hospital, he laughed. At first, Mr. Swett said he could not go to Denver because he had to work. Eventually, Mr. Swett decided he would accompany the Child to "make sure that his story was told or his side of things was told."
[¶ 58] Mr. Swett also refused to recognize the seriousness of the Child's head injury. He made comments like, "It's a bruise, a bump on the head. He's fine," and "the head injury wasn't going to kill him." The staff at Children's Hospital said that, despite being told multiple times by multiple providers that the Child's head injury was serious, Mr. Swett repeatedly stated that the Child was at Children's Hospital for feeding issues.
[¶ 59] Although the Child was transported to Children's Hospital because of his head injury, feeding was a concern throughout the Child's life. He did not gain weight normally, and his pediatrician diagnosed him with failure to thrive. The Child was hospitalized in September 2016 because the parents were not feeding him enough. Various healthcare providers tried to educate the parents on how to properly feed the Child. The parents were concerned about the Child spitting up and vomiting. However, tests indicated that, although he had "a small amount of reflux or aspiration of food," it should not be an impediment to weight gain. At the time of his head injury in January 2017, the Child's weight was below the first percentile on the growth curve. Dr. Ford stated that the Child's failure to thrive, together with the head injury, indicated his health and safety were at "high risk."
[¶ 60] The Children's Hospital staff also testified about Mr. Swett's hostile attitude. He was variously described as agitated, frustrated, and angry. Mr. Swett, himself, testified that his "frustration" was "building" while he was in Denver. The medical staff witnessed Mr. Swett's rough treatment of the Child. Mr. Swett demonstrated how he fed the child with a "vice-grip" on his neck and forcing the bottle into the Child's mouth. When the Child cried, Mr. Swett threw a blanket over the Child's head and told him to "shut up." He informed the providers who were in the room, "That's how you have to talk to him." Because of Mr. Swett's behavior, *1150 a sitter was placed in the room with the Child at all times.
[¶ 61] The defense countered this evidence with the testimony of the public health nurse who helped the family with the Child's weight and feeding issues. She said Mr. Swett was receptive to her advice and was gentle with the Child. However, she conceded on cross-examination that her interactions with Mr. Swett were limited because he had only attended five of the twenty-one meetings she had with the family.
[¶ 62] The State also presented a good deal of testimony about Mr. Swett's inconsistent statements. Dr. Ford said Mr. Swett initially told the Children's Hospital staff that he dropped the Child from a height of one foot; later, he told them the Child fell three to four feet. Detective Keller testified that Mr. Swett's account of what happened the day after the fall changed significantly from the first interview at the Sheridan hospital on January 13, 2017, to the second interview in March 2017. During the first interview, Mr. Swett said he noticed dark purple marks on the Child the morning after the fall. At the second interview, he said he did not know about the Child's injuries until they were pointed out at the pediatrician's office. During the first interview, Mr. Swett said it was Barbara Wegener's idea to take the Child to the doctor, but at the second interview, he "was adamant" that it was his idea to take the Child to the doctor. During the second interview, Mr. Swett said that he did not believe the Child had retinal hemorrhaging or a skull fracture.
[¶ 63] In summary, there was substantial evidence, without the jail incident, that the Child's injuries were not caused accidentally. The evidence about the nature of the Child's injuries; Mr. Swett's behavior; the Child's medical history, including his failure to thrive; and Mr. Swett's inconsistent statements was more than adequate to support the jury's verdict. On this record, there is no reasonable probability the verdict would have been different if the jail incident had not been admitted into evidence.
[¶ 64] Affirmed.

There was no mention in the pre-trial filings or arguments of Mr. Swett's threat to crush the victim's skull. That fact was not, therefore, a basis for admission of the evidence.