# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 97

APRIL TERM, A.D. 2020

*July 28, 2020*

RONALD RAY BLANCHARD,

Appellant
(Defendant),

v.

S-19-0272

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Campbell County*
*The Honorable Michael N. Deegan, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel

*Representing Appellee:*

Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Catherine M. Mercer, Assistant Attorney General

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, **Chief Justice**.

[¶1]    Following a jury trial, Ronald Blanchard was convicted of first degree sexual assault and incest for acts committed against his 18-year-old stepdaughter.  On appeal, he claims that the district court erred in admitting prior bad acts evidence without the required W.R.E. 404(b) pretrial hearing.  We find no reversible error and affirm.

## ISSUES

[¶2]    Mr. Blanchard presents a single issue on appeal, which he states as:

> Whether prejudicial error occurred when the State presented evidence of uncharged misconduct which it had not provided notice of and which had not been subject to a W.R.E. 404(b) admissibility analysis.

## FACTS

[¶3]    On November 20, 2018, KW was eighteen years old and lived in Gillette, Wyoming with her mother, Shoshauna Blanchard, her stepfather Ronald Blanchard, and her younger sister RB.  After she got out of high school that day, she went to her older sister JW's home. She drank vodka and whiskey for several hours and was intoxicated when a friend drove her home that evening.  When she arrived home, Mr. Blanchard was the only person home, and she joined him in the living room where he was watching TV.  They talked and watched TV, and he gave her Crown Royal, which she drank from the bottle.

[¶4]    KW passed out, and the last thing she remembered was being in the living room with Mr. Blanchard and that she was fully clothed.  At some point, she awoke to find herself undressed in her bed with Mr. Blanchard having sexual intercourse with her.  She remained conscious for three to five seconds and passed out again.

> Q.    After you passed out again, when's the next time that you wake up?
>
> A.    The next morning.
>
> Q.    What did you think the next morning?
>
> A.    I didn't think that memory – I didn't think that it was really what happened. I was hoping, but I just knew.
>
> Q.    You didn't want it to be real, did you?

1

A. No.

Q. Did you see any marks or spots on your body?

A. When I woke up and went to the bathroom, there was a hickey on my neck.

Q. Did you see Mr. Blanchard that morning?

A. Yes.

Q. Did he say anything to you?

A. He came downstairs and he said, "It's never going to happen again." And he asked me not to tell my mom or my sister.

[¶5] Following the incident, KW moved out of the Blanchard home and began staying with her older sister JW or with a friend. On December 15, 2018, Mr. Blanchard was at a bar drinking with a friend, Marvin Stetter, and told him of the November 20 incident.

Q. Did Mr. Blanchard say anything to you that stuck out that night?

A. I went to the bathroom and he followed me in there and told me he had – he felt like a piece of shit; he had sex with his stepdaughter.

Q. And what was your response to that?

A. I just walked away from him.

Q. And you said you guys were in the restroom when he said it?

A. Yep.

Q. And did he say it once or more than once?

A. He kind of followed me around trying to talk to me about it, but I just didn't want to listen to it because I wasn't too happy about it, so I wound up leaving.

2

[¶6]   On December 18, 2018, Mr. Stetter reported the conversation to Shoshauna Blanchard, KW's mother.  Ms. Blanchard tried to reach KW, and when she was unable, she contacted KW's older sister JW.  She told JW she needed to speak with her because she was unable to reach KW.

> I told [JW] that I wanted to talk to her, because [KW] wasn't answering my calls or texts.  I told her that we need to have a serious conversation about something that would change our lives seriously, and she knew exactly what I was talking about. And I asked her, I says, "Okay. Well, what do you think that you know what I'm talking about?" And she said that Ron raped [KW].

[¶7]   JW confirmed that KW was with her at her home.  Ms. Blanchard then picked them both up, and they went to the police department to report the November 20 incident.  On December 19, 2018, Mr. Blanchard was arrested, and on December 20, the State filed an information charging him with one count of first degree sexual assault (physically helpless victim) and one count of incest.

[¶8]   Before trial, Mr. Blanchard moved for disclosure of any Rule 404(b) evidence that the State intended to use against him at trial.  The State provided no such notice, but at trial it introduced testimony concerning a prior incident between Mr. Blanchard and KW.  The first-hand witness to the incident was Nathaniel Coor, whom the State identified in its pretrial memorandum as a witness that

> will testify as to his observations and concerns when regarding the Defendant, statements made by the Defendant, and any and all other information within his knowledge having relevance to this case.

[¶9]   Mr. Coor was KW's former boyfriend, and he testified that sometime close to November 2018, he was at the Blanchard home with KW and she passed out from drinking. While Mr. Coor was putting her to bed, Mr. Blanchard entered the room.

> Um, well, as I was putting her to bed he came downstairs and was just staring at us.  And I was trying to put her to bed, and he went back upstairs and then came back downstairs, like a couple of minutes later, and, um, pretty much said, "Why ain't you all up in that? Yeah, I'd be all over that." And then he went back upstairs, and then I believe came down one more time and started, like, tickling her and stuff and whatever, and then went back upstairs.

3

[¶10]  Mr. Coor testified that he decided to take KW home with him because he did not believe she was safe in her home.  He woke her up and walked her to the door, but as they were leaving they saw that KW's mother had arrived home and was sitting in the driveway inebriated and smoking a cigarette.

> Q.     Okay. What happened next?
>
> A.     After we went upstairs we were going to leave, and then seen her mom outside. And then she helps her mom inside, and then they were sitting out, like next to the front door, which is Ronald and her mother's bedroom door is like right next to.
>
> And after I'd say about five, ten minutes of them talking and whatever, Ronald comes out of his room naked and waves his dick in front of her face, laughing, and then he goes back into the room.  And then I said I'm not pretty much dealing with that, so I called her sister.  Her sister came over, and says some stuff. And then I grabbed [KW], the mom and youngest daughter, and I took them to my house.
>
> Q.     Okay.  When you say that Mr. Blanchard was waving his penis in someone's face, whose face?
>
> A.     [KW's].

[¶11]  The State then elicited testimony from two additional witnesses concerning the incident.  The victim's older sister, JW, testified:

> Q.     Okay. Around November 2018, was there a time that [Nathaniel Coor] called you to come pick him up from Mr. Blanchard's house?
>
> A.     He didn't specifically request that I pick him up; he did, however, tell me that Ron was being a creep towards my sister and that I needed to come over there and help him handle it, because he was going to go crazy. And so I was on my way over there when I got another phone call from him saying that Ron exposed himself to him and my sister, and he would like help getting my sister out of the house, because he was worried for her.

[¶12] Julianne Witham, the detective from the Gillette Police Department who investigated KW's allegation, testified:

4

Q.      Now, did [KW] tell you anything about an incident where Mr. Coor was around?

A.      She did.  She explained that roughly six to eight weeks prior, her ex-boyfriend Nathaniel Coor was over at the house, and during that time, Mr. Blanchard had been drinking and at some point took all of his clothes off and waved his penis in front of her face.

* * *.*

Q.      Okay. And did Mr. Coor make a statement to you?

A.      Yes, he did.

Q.      Okay. And what did he say about interactions with Mr. Blanchard?

A.      He said that he had seen him act inappropriately towards [KW] in the past.

Q.      Now, [KW] had told you about Mr. Blanchard sort of waving his penis at her? Did Mr. Coor talk about that?

A.      He did.

[¶13]   Defense counsel did not object to Mr. Coor's testimony or to that of JW or Detective Witham.  After the State rested, Mr. Blanchard called five witnesses and then testified on his own behalf.  Concerning the incident testified to by Mr. Coor, he denied coming out of his bedroom naked or waving his penis in KW's face.  With respect to the statement Mr. Coor attributed to him, he testified that he went to KW's bedroom because he heard Mr. Coor yelling at her.  He then testified:

Q.      And when you went down, did you tell him anything?

A.      Yeah. I said "What's the problem?"

Q.      Did you make that comment about you would hit that, or you'd be all over that, or something along those lines?

5

A. Yeah. Instead of making a bunch of noise, I said, "If I was you and I was your age, I'd be all over that. I wouldn't be hollering at her."

[¶14] Mr. Blanchard also denied KW's version of what occurred on November 20, 2018. According to his version of the events on that date, he went to a bar after work and had ten or more drinks of Crown Royal with Pepsi or Coke. He got home and the only person home was KW and she was on the couch watching television. He visited with her and then went to the garage to have a cigarette. KW joined him in the garage and did not appear to be drunk. They talked for more than thirty minutes because KW was down and then they started to leave the garage. According to Mr. Blanchard, the following then occurred:

Q. When you got ready to wind up the discussion, what happened? When you got ready to finish the discussion in the garage, what happened?

A. Well, I stood up and she stood up, and I give her a hug.

Q. Did you touch her somewhere you probably shouldn't have?

A. Well, I grabbed her butt, but at the same time, I was – I gave her a hug and told her she was beautiful and she had her whole life ahead of her, that she shouldn't be down about things. And I grabbed her butt. Why, I don't know. I just did.

Q. Was that, looking back 20-20 hindsight, was that inappropriate?

A. That was very inappropriate.

Q. What happened after you grabbed her backside?

A. She said "Ron," and I backed away, like whoa.

Q. And what happened after that?

A. Well, she got down on her knees and she started to try to undo my belt.

Q. What's going on in your head during all of this?

A.     I – my mind was like, okay, this – is this really happening?

Q.     So what happened after she started undoing your belt? Did she get the job done?

A.     Well, I helped her because it was a friction-type belt, and I had my FR pants on. And I helped her get the belt undone.

Q.     So you got yourself undone. Did you expose yourself to her?

A.     No. She unbuttoned my pants and unzipped my pants, and exposed my –

Q.     Were you erect? Were you excited?

A.     No.

Q.     What happened after you've exposed yourself, after you got your pants undone and your penis was out, what happened next?

A.     I shut her down. I shut her down.

Q.     What did you say?

A.     I put my stuff back in my pants, and I said "let's go in the house."

Q.     So what happened next?

A.     Well, we went out the garage door.  I was following her. And we got a screen door and a door, and there is a [foyer], which is approximately three and a half foot deep by roughly four feet wide, maybe three and – well, I don't know, three and a half to four feet wide.  And like I said, the stairs go downstairs and the stairs go upstairs.  I had my Wolverine work boots, and she tripped over my boots.

Q.     So what did you do when she tripped?

7

A.    She was on the stairs, I reached down to help her up, and I tripped over my boots too.

Q.    Did you fall on top of her?

A.    No, I didn't fall on top of her.

Q.    How did you fall?

A.    I fell beside her.

Q.    So are you like laying on the foyer? Are you laying on the stairs? What does that look like?

A.    I'm on the stairs next to her and we're laughing and giggling, because it just felt – we both felt embarrassed because we tripped over my boots.

Q.    What happened next, Ron?

A.    Well, we were in each other's arms, you know.  And I got up, she got – and helped her up, and she walked in front of my bedroom.

Q.    What happened when you – did you go up to the bedroom?

A.    Yes, I got up –

Q.    Did she –

A.    --to the bedroom.

Q.    Did she go to the bedroom?

A.    Yes.

* * * *

Q.    What happened after you got in the bedroom?

A.    We were kissing.

8

Q.      Were you TV movie kind of passionate kissing?

A.      Yeah, we were. We were kissing, and, yeah, kinda, yeah.

Q.      Did you get undressed?

A.      Well, she started to take her shirt off.  I helped her take her shirt off.

Q.      Did you take your shirt off?

A.      Yes.

Q.      Did both of you get completely unclothed?

A.      Yes.

Q.      What happened? What happened after you both got out of your clothing?

A.      Well, I couldn't get it up, so she said let's get in the shower.

Q.      So did you go into the bathroom?

A.      Yes, I did.

* * * *

Q.      Who went into the bathroom first?

A.      She did.

Q.      Did she get into the shower?

A.      Yes.

* * * *

Q.      Did you get in the shower?

A.      Yes, I did.

9

Q.    Was [KW] under the water? Were you under the water? What did that look like?

A.    I was under the water, and she was facing the wall, which faces east.

Q.    Were you able to get an erection at all?

A.    No.

Q.    Now, Ron, when you've been drinking, and again I apologize for the way we've got to talk here but it's important. When you cannot get an erection, are you semi-erect? Are you completely? What does that look like?

A.    It just don't work at all. It's just a limp noodle, no nothing.

Q.    Is that what you had when you got into the shower?

A.    Yes.

Q.    So you get into the shower, [KW] is in the shower. What happened next?

A.    Well, I'm in the shower, she's facing the wall and she's looking back at me. And I can't get it up, so I grab her hair, and I go to pull on her hair, thinking that would help me to get it up. And it didn't work. And she said stop, so I stopped everything. And she got out of the shower.

Q.    Did she say why she wanted to stop? What brought that about?

A.    She had a braid in her hair that went from the front all the way to the back and she had a rubber band in up front, I don't understand what that was there, but it was there. And she wanted that pulled out, so we were trying to get that out of her hair. So I grabbed the scissors, I cut that out of her hair.

Q.    Did you get back in the shower after that?

A.    Yes, I did.

Q.    Did she get back in the shower after that?

A.    Yes, she did.

Q.    Was it the same situation where you were under the water and she was towards the back?

A.    Yes.

Q.    What happened after you got back in the shower?

A.    Well, pretty much the same instance. I pulled her hair and tried to do it again, and it wasn't working, so I got out of the shower and put on my pj's.

Q.    Okay. Did you see [KW] get out of the shower?

A.    I didn't really pay attention at that point.

Q.    So, Ron, what's going through your mind? You've gotten unclothed in your bedroom, you've gotten in the shower, back out of the shower, back in the shower unclothed. What's going through your mind? What are you thinking about?

A.    At that time I'm glad that – I'm thinking in my head I'm glad that it didn't happen.

Q.    Okay. Do you mean after you got out and got in your pajamas?

A.    Yeah.

Q.    So were you thinking? What were you thinking when you were in the shower when you were with her?

A.    At that time I was thinking of having sex.

Q.    Okay. Did it ever happen?

A.    No, it did not happen.

[¶15] Mr. Blanchard testified that the next morning he spoke briefly with KW about what had occurred the night before.[1]

> Q. Did you have a conversation? Well, did she tell you anything?
>
> A. Yeah. She said that will never happen again.
>
> Q. What did you tell her?
>
> A. I said, "please don't tell your mom or your sisters."

[¶16] The jury returned a verdict of guilty on both the first degree sexual assault and incest counts. As to the first degree sexual assault count, the jury was given two options: that Mr. Blanchard "knew that [KW] was physically helpless and had not consented," or that he "reasonably should have known that [KW] was physically helpless and had not consented." The jury answered the first option in the negative but found that Mr. Blanchard reasonably should have known that KW was physically helpless and had not consented.

[¶17] The district court sentenced Mr. Blanchard to eighteen to twenty-five years imprisonment on the first degree sexual assault conviction, and to five to ten years on the incest conviction, to be served concurrently. He timely appealed to this Court.

## DISCUSSION

### A. Standard of Review

[¶18] The State concedes, as it must, that the testimony of Nathaniel Coor, JW, and Detective Witham concerning the incident witnessed by Mr. Coor was Rule 404(b) evidence. *See Mayhew v. State*, 2019 WY 38, ¶ 31, 438 P.3d 617, 627 (Wyo. 2019) (sexual behavior with a stepchild is "unusual sexual behavior" subject to Rule 404(b) (quoting *Swett v. State*, 2018 WY 144, ¶ 40, 431 P.3d 1135, 1146 (Wyo. 2018))); *Lindstrom v. State*, 2015 WY 28, ¶ 18, 343 P.3d 792, 797 (Wyo. 2015) ("Evidence of a propensity toward sexual deviation is character evidence."). "A core principle of Wyoming Rule of Evidence 404(b) 'is that the defendant in a criminal case should not be convicted because he is an unsavory person, nor because of past misdeeds, but only because of his guilt of the particular crime charged.'" *Vinson v. State*, 2020 WY 93, ¶ 17, ___ P.3d ___ (Wyo. 2020) (quoting *Leyva v. State*, 2007 WY 136, ¶ 19, 165 P.3d 446, 452 (Wyo. 2007)). To guard

---

[1] On cross-examination, KW did not deny Mr. Blanchard's account of what happened in the garage or the shower. She testified that she did not remember those events and that the only thing she remembered after blacking out was waking to find Mr. Blanchard having sex with her.

12

against that risk, the State must provide notice of its intent to introduce 404(b) evidence, and the district court must assess its admissibility under our *Gleason* framework. *Lajeunesse v. State*, 2020 WY 29, ¶ 11, 458 P.3d 1213, 1218 (Wyo. 2020) (reviewing trial court's 404(b) analysis under *Gleason v. State*, 2002 WY 161, ¶ 30, 57 P.3d 332, 343 (Wyo. 2002)).

[¶19] Inexplicably, the prosecutor in this case failed to provide notice of the State's intent to introduce 404(b) evidence, despite Mr. Blanchard's request for it. We explained the difficulty that this creates in *Broberg v. State*, 2018 WY 113, 428 P.3d 167 (Wyo. 2018).

Mr. Broberg filed a pretrial demand for disclosure of 404(b) evidence, thereby timely objecting to the introduction of 404(b) evidence and permitting our review for an abuse of discretion. *Howard* [*v. State*, 2002 WY 40], ¶ 23, 42 P.3d [483,] 491 [(Wyo. 2002)]. However, application of the abuse of discretion standard is difficult in this matter. Typically, when a defendant files a demand for disclosure of W.R.E. 404(b) evidence, the State provides notice of the 404(b) evidence it intends to introduce, the trial court is alerted to the evidentiary issue, and a pretrial *Gleason* hearing is held. *See, e.g.*, *Volpi v. State*, 2018 WY 66, ¶¶ 11-12, 419 P.3d 884, 888-89 (Wyo. 2018); *Howard*, ¶ 23, 42 P.3d at 491; *Vigil v. State*, 926 P.2d 351, 354 (Wyo. 1996). This sequence of events enables us to review the district court's evidentiary ruling for an abuse of discretion.

In this case, we are unable to review a 404(b) evidentiary ruling made in the usual course. After receiving Mr. Broberg's demand, the State failed to disclose its intent to use W.R.E. 404(b) evidence and failed to provide the purpose for admission of such evidence prior to trial. The State's omissions prevented the district court from holding the required *Gleason* hearing **prior to admission** of the 404(b) evidence. . . .

\* \* \* \*

While recognizing the district court was unable to make a meaningful and timely evidentiary ruling under the circumstances of this case, AB's testimony, which fell within the purview of W.R.E. 404(b), was erroneously admitted, without the required *Gleason* analysis. Accordingly, our decision turns on whether the admission of AB's testimony

13

prejudiced Mr. Broberg. "Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made." *Vigil v. State*, 2010 WY 15, ¶ 11, 224 P.3d 31, 36 (Wyo. 2010). "Prejudicial error requires reversal, while harmless error does not." *Payseno v. State*, 2014 WY 108, ¶ 20, 332 P.3d 1176, 1182 (Wyo. 2014) (quoting *Nelson v. State*, 2010 WY 159, ¶ 29, 245 P.3d 282, 289 (Wyo. 2010) ).

*Broberg*, ¶¶ 16, 19, 428 P.3d at 171-72 (footnotes omitted).

[¶20] Because the prosecutor failed to provide notice of the State's intent to introduce 404(b) evidence, the district court had no opportunity to exercise its discretion, and we cannot review for an abuse of discretion. *See also Lajeunesse*, ¶ 12, 458 P.3d at 1218 ("[*Gleason*] analysis is intended to be conducted by the trial court, and we do not apply it anew on appeal." (quoting *Mayhew*, ¶ 27, 438 P.3d at 624)); *Schreibvogel v. State*, 2010 WY 45, ¶ 33, 228 P.3d 874, 885 (Wyo. 2010) ("[A]pplication of an abuse of discretion standard is difficult, if not impossible, in a situation where the [Rule 404(b)] issue is not brought to the attention of the district court for an evidentiary ruling."). As in *Broberg*, the admission of the 404(b) evidence in this case was error, and our review is confined to determining whether the error was prejudicial.[2]

[¶21] We turn then to the question of whether the verdict against Mr. Blanchard might have been more favorable had the prior misconduct evidence not been admitted.

## B. Review for Prejudice

[¶22] Mr. Blanchard claims that "[a]lthough all misconduct evidence has an inherent danger of prejudice, the evidence utilized in this case, that Mr. Blanchard exposed his penis and shook it in front of his step-daughter, while her mother and boyfriend witnessed the event is some of the worst." He argues that the evidence prejudiced him by making him appear "morally disreputable," "distasteful," and prone to acting offensively toward his stepdaughter. We disagree. Based on the entirety of the evidence, we find it unlikely that

---

[2] We assume that had Mr. Blanchard objected to the 404(b) evidence, the district court would have excluded it. *See McGill v. State*, 2015 WY 132, ¶ 13, 357 P.3d 1140, 1146 (Wyo. 2015) (objection sustained where 404(b) testimony went beyond disclosed evidence). We also remind prosecutors, however, that they have an ethical obligation to comply with our long-established procedure governing the introduction of 404(b) evidence, and we caution against a strategy of bypassing that procedure in favor of a harmless error review. *See Capshaw v. State*, 11 P.3d 905, 909 (Wyo. 2000) (prosecutor's reference to prior bad acts evidence in opening statement before court ruled on its admissibility was contrary to ordered process for admission of such evidence and was inconsistent with prosecutor's ethical obligation to further the ends of justice (citing Wyo. R. Prof. Conduct 3.8, comment 1)); *see also Curl v. State*, 898 P.2d 369, 376 (Wyo. 1995) ("A prosecutor . . . has the responsibilities of a minister of justice and not simply that of a zealous no-holds-barred advocate for conviction." (citing Wyo. R. Prof. Conduct 3.8, comment 1)).

the State's 404(b) evidence affected the jury's verdict on either charge against Mr. Blanchard.

[¶23] The charge of first degree sexual assault required that the jury find that Mr. Blanchard inflicted sexual intrusion on KW, that KW was physically helpless, and that Mr. Blanchard knew or reasonably should have known that KW was physically helpless and had not consented. *See* Wyo. Stat. Ann. 6-2-302(a)(iii) (LexisNexis 2019). The charge of incest required that the jury find that Mr. Blanchard knowingly committed sexual intrusion or sexual contact with a stepchild. *See* Wyo. Stat. Ann. § 6-4-402(a)(iii) (LexisNexis 2019).

[¶24] KW testified that she went to her sister JW's home on the afternoon of November 20, 2018, that she drank whiskey and vodka for several hours, and that she was inebriated when she left her sister's home and returned to the Blanchard home that evening. JW did not specifically recall the November 20 date, but she testified that when KW would visit her home, she would drink a lot of alcohol.[3] KW testified that she blacked out after drinking additional alcohol with Mr. Blanchard and woke to him having sexual intercourse with her. JW testified that KW essentially moved in with her on November 21 and five days later told her what happened.

> Q. Okay. When did [KW] disclose to you about what had happened between her and Mr. Blanchard?
>
> A. Five days after the fact.
>
> Q. What was she like in those five days?
>
> A. Um, I would have to say completely out of her mind, just drunk. The only way I even found out was because she had fallen down in my bathroom, and so I decided to ask her what was going on, and that's when she broke down and told me everything.
>
> Q. Now, had her drinking in those five days been worse than you had seen before?
>
> A. Yes.
>
> Q. Okay. And what did she tell you about what had happened between her and Mr. Blanchard?

---

[3] Several other witnesses testified to KW's excessive drinking, including her maternal grandfather, her former boyfriend, Nathaniel Coor, her paternal grandmother, and Mr. Blanchard.

A. The first words out of her mouth, as she just started bawling, was "He raped me, he raped me, he raped me." And I said, "Who did?" And she said "Ron did."

[¶25] In addition to KW's testimony and her prior consistent statement to her sister, two witnesses testified that Mr. Blanchard confessed the incident to them. Mr. Blanchard's friend, Marvin Stetter, testified that Mr. Blanchard told him that he "had sex with his stepdaughter." David Golay, KW's grandfather, testified that on December 9, 2018, Mr. Blanchard confessed to him while they were at a family gathering to celebrate the Blanchard's purchase of a new home.

Q. Did there come an occasion on that night when you had a private conversation with Mr. Blanchard?

A. Yes, sir.

Q. Where did that conversation take place?

A. Out in the garage.

Q. Why out in the garage?

A. When I arrived, I went up there, my daughter was cooking dinner, sat there – and pardon my language – sat there and was BSing with everybody. And Ron said, "Hey, Dave, can I talk to you down in the garage?" And we went down in the garage and he's got a table and chairs down there. They're moving in, and there's a bunch of boxes and everything.

Q. And who else was in the garage with you and Mr. Blanchard?

A. Just me and him.

Q. Okay. And what did Mr. Blanchard tell you?

A. Well, we sat there and BS'ed for a little bit, and he said "Dave" – can I use the same language Ron used?

Q. If you're going to quote somebody, yes, absolutely that's all right.

16

A. Okay. Sit there Ron goes, "Dave," he said, "I'm going to hell." And I'm, "What?" He goes, "I'm going to hell." "What are you talking about?" He goes, "I fucked [KW]." I go, "What?" He goes, "I fucked [KW]" And I kind of slapped him on the cheek, and "That's your daughter. How could you do such a thing?" And he sat there and he goes, "I don't know." He says, "I come home and she was upstairs sleeping on the couch. Woke up, we did a couple of shots. One thing led to another," and he said, "I'm going to hell." He said, "I fucked her." And I asked him how he could do that; again I said, "That's your daughter."

Ron had been around the girls since they were three. He'd been their dad since they've been about six is when her and Shaunie got married, him and Shaunie got married.

[¶26] Mr. Blanchard did not flatly deny the testimony of Mr. Stetter or Mr. Golay. He testified only that he did not recall the conversations.

Q. Do you remember having a conversation with Mr. Golay?

A. Honestly, I do remember being down in the garage with Mr. Golay; but honestly, I can't tell you what we had for conversation because I had drank so damn much.

Q. Do you remember telling him what he testified to?

A. I do not recall that. And I got to say, he testified that he hit me, I don't think that he did because I was drunk enough, I probably would have hit him back.

Q. Do you remember being at the bar with Marvin Stetter?

A. Yeah, I've been to the bar hundreds of times with Marvin Stetter.

Q. Prior to all of this, did you consider Mr. Stetter a friend?

A. We tolerate each other.

Q. Okay. Was he a friend that you would have confided anything to?

17

A.    Not that I believe, no.

Q.    Do you ever remember telling Marvin Stetter the things that he testified to the jury about?

A.    No, I do not recall telling Marvin Stetter anything like that, no.

[¶27]  In addition to the above-cited evidence is Mr. Blanchard's detailed testimony in which he admitted to a sexual encounter with KW and that his intention during that encounter was to have sex with her.  In terms of evidence, that would make him appear morally disreputable, distasteful, and prone to acting offensively toward KW, it seems likely that the impact of the State's 404(b) evidence paled in comparison to Mr. Blanchard's own testimony.

[¶28]  Considering the undisputed evidence that KW often drank to excess and to the point of being incapacitated, the evidence corroborating her testimony, and Mr. Blanchard's own testimony, which placed him in a poor light, we are unable to find a reasonable probability that the verdict against Mr. Blanchard would have been more favorable had the State's 404(b) evidence not been admitted.  The error in admitting it was therefore harmless.

[¶29]  Affirmed.