# IN THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 4

OCTOBER TERM, A.D. 2021

January 11, 2022

CHARLES LAIRD KINCAID,

Appellant
(Defendant),

v.                                                                S-21-0089

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Sweetwater County*
*The Honorable Richard L. Lavery, Judge*

*Representing Appellant:*
    Eric F. Phillips of Eric F. Phillips Law Office, Rock Springs, Wyoming.

*Representing Appellee:*
    Bridget L. Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Timothy P. Zintak, Senior Assistant Attorney General. Argument by Mr. Zintak.

*Before FOX, C.J., and DAVIS, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE:** This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BOOMGAARDEN, Justice.**

[¶1]    A jury found Charles Kincaid guilty of aggravated assault and battery under Wyo. Stat. Ann. § 6-2-502(a)(iii) for threatening to use a drawn deadly weapon on his wife Ashton Crain.[1]  Mr. Kincaid argues the district court abused its discretion by admitting Ms. Crain's testimony about a prior incident between her and Mr. Kincaid in Park City, Utah. He maintains that the testimony constituted uncharged misconduct evidence for which the State filed no W.R.E. 404(b) notice, was not admissible under the open door doctrine, and prejudiced him.  The State responds that the Park City testimony was admissible to rehabilitate Ms. Crain, was admissible under the open door doctrine, and, in any event, did not prejudice Mr. Kincaid.  We reverse and remand for a new trial because the district court abused its discretion by admitting the Park City testimony and that testimony prejudiced Mr. Kincaid.

*ISSUE*

[¶2]    The dispositive issue is:

> Did the district court abuse its discretion by admitting the Park City testimony and, if so, did that testimony prejudice Mr. Kincaid?[2]

*FACTS*

[¶3]    Mr. Kincaid and Ms. Crain met in 2016 and married in July 2019.  Their honeymoon period was short-lived.  In October, she asked him for a divorce; in December, she told him she had developed feelings for someone else; and, the following month, she told him she had acted on those feelings.  When Mr. Kincaid was discharged from the military, they decided to give the marriage one more try and he moved into her apartment in Rock Springs, Wyoming in early February.

[¶4]    The incident underlying Mr. Kincaid's conviction occurred late on the evening of February 24.  That morning, Ms. Crain traveled from Rock Springs to Rawlins to see her audiology patients.  When she returned home that evening Mr. Kincaid had prepared dinner and appeared to be intoxicated.  Ms. Crain asked Mr. Kincaid how much he had to drink

---

[1] By Mr. Kincaid's trial in September 2020, Ms. Crain had filed for divorce and those proceedings were pending.

[2] Mr. Kincaid raises a second issue: whether the COVID-19 protocols the district court implemented denied him a fair trial.  He did not raise this issue in the district court.  At oral argument, he acknowledged that the COVID-19 pandemic necessitated certain safety protocols and that he did not object to the protocols the court implemented for his trial.  We do not further address Mr. Kincaid's second issue because we reverse and remand for a new trial.

1

and he said he did not want to talk about it. After dinner, they watched television for an hour and then she went to bed early.

[¶5]    When Mr. Kincaid woke her up later that night to tell her that her puppy was outside, she jumped out of bed and ran outside to retrieve the puppy. On returning inside, Ms. Crain noticed that Mr. Kincaid had a .44 magnum revolver tucked into his waistband so she retreated to the bedroom. Mr. Kincaid began walking back and forth between the kitchen and bedroom, music blaring in the background, trying to have a conversation with her. During the conversation, Mr. Kincaid mentioned the name of the person with whom she had an affair. Ms. Crain asked Mr. Kincaid to turn the music down and pretended to go to sleep in hopes that he would leave her alone.

[¶6]    Mr. Kincaid later entered the bedroom, removed the gun from his waistband, and opened the chamber. He told Ms. Crain that he had removed five bullets from the gun. She heard him tap the bullets into his hand and put them in his pocket. She thus assumed there was one bullet left in the chamber. Mr. Kincaid then took the gun, cocked the trigger, and pointed it to his right temple. He pulled the trigger but nothing happened. Ms. Crain begged him not to hurt himself. Again, he cocked the trigger, pointed it to his head, and pulled the trigger but nothing happened. Ms. Crain reached for her phone on the nightstand and dialed 911, at which point Mr. Kincaid pointed the gun at her and said, "don't fucking call." He pulled the trigger but nothing happened.

[¶7]    Ms. Crain remained on the line with a 911 dispatcher until Officer Amanda Buller of the Rock Spring Police Department arrived. After separating Mr. Kincaid and Ms. Crain, Officer Buller took Ms. Crain's statement. Officer Buller's body camera recorded that conversation. Another officer arrived to collect evidence and take photographs. He found bullets on the kitchen counter, along with bullets and two guns in a bedroom nightstand.

[¶8]    After Mr. Kincaid was arrested, Officer Austin Porter transported him to the hospital to get him medically cleared for jail because he was intoxicated. Medical staff asked Mr. Kincaid how much he had to drink that night. He responded that he drank enough to forget that Ms. Crain cheated on him. He also used marijuana. Mr. Kincaid told Officer Porter "you're welcome for me not killing him and her[,]" in reference to the affair.

### Pretrial Proceedings

[¶9]    The State charged Mr. Kincaid with one count of aggravated assault and battery under Wyo. Stat. Ann. § 6-2-502(a)(iii).[3] He waived preliminary hearing and the case was

---

[3] Section 6-2-502(a)(iii) states that "[a] person is guilty of aggravated assault and battery if he . . . [t]hreatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or

bound over to district court, where he pleaded not guilty. Trial was scheduled for September 2020. The case management order included a deadline for the State to provide Mr. Kincaid any known W.R.E. 404(b) evidence. No notice was sent. At a pretrial conference, the court asked the prosecutor and defense counsel whether there were any 404(b) issues and they both said there were not. The case proceeded to trial without any further pretrial issues relevant to this appeal.

*Trial*

[¶10]   The State's case hinged on Ms. Crain's credibility. It called the following witnesses: Ms. Crain, the 911 dispatcher, Officer Buller, Officer Porter, the officer who collected evidence from the apartment, and the detective assigned the case. It introduced the following exhibits: a recording of the 911 call, body camera footage from the apartment and hospital, and photographs of the apartment.

[¶11]   The defense waived opening and did not call any witnesses. In closing, defense counsel argued that the State's case consisted of little more than Ms. Crain's statements. In challenging her credibility, he argued that Ms. Crain was a deceitful person because she had an affair, illegally used marijuana in Wyoming, and hid her marijuana use from her employer. From there, he suggested that she deliberately fabricated the incident to get Mr. Kincaid arrested, which benefited her. In the alternative, defense counsel suggested that Ms. Crain's false allegation may have stemmed from her use of several prescription medications, together with marijuana, or her sudden cessation of those medications.

[¶12] Direct and cross-examination testimony about Ms. Crain's mental health and prescription medications was central to admission of the Park City testimony on redirect.

### Direct Examination

[¶13]   On direct, the prosecutor briefly questioned Ms. Crain about her mental health, medications, and panic attacks. Ms. Crain testified that she went to bed early on February 24 "because [she] was exhausted from all of the tension and nerves of driving in awful conditions and seeing patients all day." She confirmed that she had depression and anxiety. In December 2019, a psychiatrist prescribed her two antidepressants, an anxiety medication, and a medication for nightmares. She faithfully took the medications for the first month but then discontinued the antidepressants because they made her feel nauseous and "loopy[.]" She continued taking the anxiety and nightmare medications as needed. She did not take any medication on February 24.

---

abode or to prevent serious bodily injury to another[.]" Wyo. Stat. Ann. § 6-2-502(a)(iii) (LexisNexis 2021).

[¶14]  Ms. Crain also confirmed that she had a panic attack during the 911 call.  She explained that when she had panic attacks, her heart raced, her voice trembled, she could not breathe, she cried, and it was hard to catch her breath, but she could still function.  How long her panic attacks lasted depended on their severity and the surrounding circumstances.

### Cross-Examination

[¶15]  On cross-examination, defense counsel questioned Ms. Crain about her marijuana use, her affair, whether Mr. Kincaid's incarceration benefited her, her medications, and her panic attacks.

[¶16]  In response to defense counsel's questions about her medications, Ms. Crain confirmed that she had several prescription bottles on her nightstand on February 24.  In December 2019, a psychiatrist prescribed her four medications: Bupropion for depression, Clonazepam for panic attacks and anxiety, Escitalopram for depression, and Prazosin for nightmares.  One was to be taken in the morning, one was to be taken in the evening, and two were to be taken as needed.  Possible side effects of Clonazepam included paranoia, impaired memory, impaired judgment, and coordination issues.  That medication made her "feel foggy[,]" which is why she did not take it often.

[¶17]  Ms. Crain repeated that she faithfully took the medications at first but then stopped taking them because she did not like the way they made her feel.  She last took the anxiety medication within a month of the February 24 incident, had not taken the other medications for some time, and did not use marijuana at the same time as the medications.

[¶18]  In response to defense counsel's questions about her panic attacks, Ms. Crain testified that, leading up to the February 24 incident, she experienced approximately one panic attack a week.  Most attacks stemmed from "flashbacks and PTSD from past events"; thus, "something associated with trauma" triggered a panic attack once a week.  When she had a panic attack, medication was her last resort.  She would first try other techniques, such as deep breathing and grounding exercises.  How quickly she could calm down depended on the severity of the attack and what had triggered it.  She exhibited signs of a panic attack during both the 911 call and her conversation with Officer Buller.  But her panic attacks that night did not affect her memory about what happened.

### Initial Redirect

[¶19]  On redirect, the prosecutor asked Ms. Crain follow-up questions about her medications.  Ms. Crain confirmed that an incident involving Mr. Kincaid led her to see a psychiatrist in December 2019 and obtain the prescriptions.  The prosecutor asked her to explain what happened.  When she began testifying about a November 2019 conference in Park City, Utah, defense counsel lodged a 404(b) objection and the court recessed to discuss the matter outside the jury's presence.

## Conference and Evidentiary Ruling

[¶20]  In conference, defense counsel argued the State should have filed a W.R.E. 404(b) notice if it intended to elicit testimony from Ms. Crain about the Park City incident.  The State countered that defense counsel opened the door to the testimony and it was admissible to rehabilitate Ms. Crain.

[¶21]  After reviewing a transcript of cross-examination, the court decided Ms. Crain could testify about the Park City incident.  In support of its decision, the court noted that defense counsel had asked Ms. Crain about medications, including how often they were prescribed, whether she took them, and why she took them.  In addition, defense counsel elicited testimony that they were prescribed based on past trauma.  The court believed it was "fair for the State to delve into that a little bit in a way to rehabilitate her, because so much gives the impression" she took the medications "for some unknown reason" and it was "confusing or difficult to understand why she would be doing that[.]"  It added that the prosecutor was "attempting to rehabilitate that and at least give her an opportunity to say why."  Defense counsel declined the court's offer to provide the jury a limiting instruction.

## Resumed Redirect – Park City Testimony

[¶22]  On resuming redirect, the prosecutor asked Ms. Crain to address the incident that caused her to seek medical help and she testified to the following.

[¶23]  In November 2019, she went to a resort in Park City, Utah for a company-sponsored training event.  She brought Mr. Kincaid with her because significant others were allowed to stay at the resort while employees attended training.  Friday went well—Saturday did not.  On Saturday she finished classes around 5:00 p.m., returned to the hotel room, and discovered that Mr. Kincaid was drunk.  This disappointed her because she told him not to drink that weekend.  She "was fearful of humiliation and what could unravel" if he drank.  Ms. Crain asked Mr. Kincaid to stay in the room while she attended a closing event with her colleagues that evening.

[¶24]  On her way back to the room later that night, she observed hotel security at the front door.  She hid in the hallway until security left and then entered the room and asked Mr. Kincaid what happened.  He told her that he had requested bath salts and, when someone brought them up, he went to the safe to get some money to tip them.  She later found out that hotel staff called the police because they noticed he had a firearm and they felt unsafe.

[¶25]  Ms. Crain tried to calm Mr. Kincaid down because he wanted to leave the room to go party.  She dropped to her knees and begged him not to leave the room, at which point Mr. Kincaid threatened to tell her supervisor that she had previously used marijuana.  He had made a similar threat before.  While she was on her knees begging him not to leave the room, he pulled out his phone and either recorded or pretended to record her.

5

[¶26] The police eventually arrived and confirmed that Mr. Kincaid had been drinking. They asked Ms. Crain if she felt safe remaining with Mr. Kincaid that night. To keep him out of trouble, she said she would be fine. The police asked her what she wanted to do and she suggested they take his guns and knife and then she would get him to sleep. That night she slept "[o]n the bathroom floor, with the door locked."

[¶27] The incident "was horrifying" for Ms. Crain because it was her first professional event and she feared Mr. Kincaid would humiliate her. That Mr. Kincaid recorded her while she was in a state of panic also traumatized her. After the Park City incident she told Mr. Kincaid that they were getting a divorce and arranged to see a psychiatrist.

### Closing Arguments & Verdict

[¶28] The prosecutor mentioned the Park City incident once in closing and once in rebuttal. We discuss those statements in more detail as relevant to our prejudice analysis.

[¶29] The jury found Mr. Kincaid guilty of aggravated assault and battery.

### *Conviction and Sentence*

[¶30] Mr. Kincaid was convicted and sentenced to seven to ten years in prison.

### *STANDARD OF REVIEW*

[¶31] We review the district court's admission of the Park City testimony for an abuse of discretion because, although Mr. Kincaid made no pretrial W.R.E. 404(b) demand, the district court's case management order preemptively set a deadline for the State to provide Mr. Kincaid "any known WRE 404(b) [] evidence" and, in any event, Mr. Kincaid objected to the Park City testimony on 404(b) grounds at trial. *Gutierrez v. State*, 2020 WY 150, ¶ 4, 477 P.3d 528, 530 (Wyo. 2020) (reviewing an evidentiary issue for an abuse of discretion rather than plain error because, although Mr. Gutierrez did not file a pretrial 404(b) demand or object to the evidence at trial, the district court's pretrial scheduling and discovery order required the State to provide notice of its intent to introduce 404(b) evidence, thus preserving the issue for appeal); *Broberg v. State*, 2018 WY 113, ¶ 15, 428 P.3d 167, 171 (Wyo. 2018) ("We review challenges to the admission of evidence for an abuse of discretion when an objection has been lodged." (citation omitted)). Mr. Kincaid has the burden to show an abuse of discretion. *See Swett v. State*, 2018 WY 144, ¶ 11, 431 P.3d 1135, 1140 (Wyo. 2018) (citation omitted).

[¶32] If the court erred by admitting the Park City testimony, then we must determine whether that error was prejudicial. *Id.* ¶ 12, 431 P.3d at 1140 (citations omitted). The error was prejudicial if "there is a reasonable probability that, in the absence of the [Park City testimony], the verdict would have been more favorable" to Mr. Kincaid. *See id.* (citation

6

omitted).  Mr. Kincaid also has the burden to show prejudice.  *See id.* ¶ 42, 431 P.3d at 1146 (citation omitted).

## *DISCUSSION*

### *The district court abused its discretion by admitting Park City testimony and that testimony prejudiced Mr. Kincaid.*

[¶33]  Mr. Kincaid argues the district court abused its discretion by admitting the Park City testimony because the State did not provide him pretrial notice that it intended to introduce W.R.E. 404(b) evidence and he did not open the door to it.  He further contends that the testimony prejudiced him.  Even though the State did not provide notice of its intent to introduce 404(b) evidence, it contends the Park City testimony was admissible both to rehabilitate Ms. Crain and because Mr. Kincaid opened the door.  The State further maintains that, even if it was inadmissible, the Park City testimony did not prejudice Mr. Kincaid.

### A. Admissibility

[¶34]  W.R.E. 404(b) provides:

> (b) *Other crimes, wrongs, or acts*. – Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Evidence triggering 404(b) scrutiny is not limited to evidence that the defendant committed other crimes; it includes evidence that may negatively affect the jury's judgment of the defendant's character.  *Cox v. State*, 2020 WY 147, ¶ 20, 477 P.3d 82, 86 (Wyo. 2020) (citing *Putnam v. State*, 2020 WY 133, ¶ 30, 474 P.3d 613, 622 (Wyo. 2020)).

[¶35]  A core principle of W.R.E. 404(b) is that a jury should not convict a defendant due to his bad character or for prior misdeeds, but only if he is guilty of the charged crime(s).  *Jackson v. State*, 2021 WY 92, ¶ 10, 492 P.3d 911, 915–16 (Wyo. 2021) (citing *Blanchard v. State*, 2020 WY 97, ¶ 18, 468 P.3d 685, 691 (Wyo. 2020)).  To protect against conviction for the wrong reason, the State must notify the defendant if it intends to introduce 404(b)

7

evidence. *Id.* ¶ 10, 492 P.3d at 916 (citing *Gutierrez*, ¶ 4, 477 P.3d at 530). Then the district court must hold a *Gleason* hearing and evaluate various factors to determine whether the 404(b) evidence is admissible. *Id.* (citing *Putnam*, ¶ 31, 474 P.3d at 622). To be admissible:

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*Id.* (quoting *Putnam*, ¶ 31, 474 P.3d at 622).

[¶36]  The parties do not dispute that the Park City testimony constitutes W.R.E. 404(b) evidence. But the court did not hold a *Gleason* hearing because the State failed to provide pretrial notice of its intent to use that testimony. Ordinarily, under these circumstances, we would go directly to a prejudice analysis. *See, e.g.*, *Mitchell v. State*, 2020 WY 142, ¶ 29, 476 P.3d 224, 235 (Wyo. 2020) ("When there is no *Gleason* hearing at or before trial, we can only look to whether admission was prejudicial." (citation omitted)); *Putnam*, ¶ 27 n.3, 474 P.3d at 620 n.3 (noting that, when the State provides no notice and then introduces the 404(b) evidence anyway, "we are then cast adrift [on appeal] without the requisite trial court analysis and left to fend for ourselves with nothing but a prejudice analysis"); *Blanchard*, ¶¶ 20–21, 468 P.3d at 692. Here, however, we must first consider whether the Park City testimony was admissible to rehabilitate Ms. Crain or because defense counsel opened the door.

### 1. Rehabilitation

[¶37]  The State maintains that *Trujillo v. State*, 953 P.2d 1182 (Wyo. 1998) supports the district court's admission of the Park City testimony because it "permits the State to respond with rehabilitation evidence of other incidents when a defendant characterizes a victim's allegations as being caused by the victim's mental illness." While the State acknowledges that the prosecution in *Trujillo* filed pretrial notice of its intent to introduce W.R.E. 404(b) evidence, it emphasizes that the prosecution there knew, before trial, that the defense intended to use the victim's medical records to attack her credibility. According to the State, because it could not have anticipated the "expansive level of cross-examination about [Ms.] Crain's mental health medication[,]" the district court properly admitted the Park City testimony to rehabilitate Ms. Crain. The State's reliance on *Trujillo* is misplaced.

8

[¶38]   Mr. Trujillo was charged with aggravated assault and battery, as well as kidnapping, for brutally beating and forcibly confining his pregnant girlfriend, Ms. Newsome. *Trujillo*, 953 P.2d at 1184.  Before trial, the State knew that Mr. Trujillo intended to use medical records about Ms. Newsome's psychological disorders so it filed a motion in limine to exclude evidence about her mental health.[4]  *Id.* at 1185.  The State also filed notice of its intent to introduce W.R.E. 404(b) evidence, including evidence about Mr. Trujillo's prior assaultive conduct towards Ms. Newsome and others.  *Id.*  The court held a hearing on the admissibility of Ms. Newsome's medical records and the 404(b) evidence.  *Id.*  It reserved ruling on the medical evidence, but admitted the 404(b) evidence directly related to Ms. Newsome and about Mr. Trujillo's assaultive conduct towards others.  *Id.*

[¶39]   On appeal from his conviction for the charged offenses, Mr. Trujillo argued the court erred by admitting evidence about his prior assaultive acts against Ms. Newsome and others.  *Id.* at 1185–86.  He did not dispute that the evidence was relevant under W.R.E. 404(b), nor did he dispute that the court properly conducted a hearing on its admissibility. *Id.* at 1186.  He contended the "court failed to properly balance the evidence under W.R.E. 403[,]" as "the sheer number of incidents presented to the jury was excessive."  *Id.*  We affirmed because the record showed the court carefully weighed the State's proposed evidence under W.R.E. 403, and appropriately admitted the evidence to corroborate Ms. Newsome's testimony given Mr. Trujillo's credibility attack.  *Id.*

[¶40]   As a preliminary matter, the State mischaracterizes Mr. Kincaid's attack on Ms. Crain's credibility in an attempt to analogize this case to *Trujillo*.  The State asserts, for example, that Mr. Kincaid's "cross-examination evinced the central thrust of his defense at trial, which was to imply that [Ms.] Crain's mental instability caused her to fabricate her recollection of the charged aggravated assault and battery."  It further asserts that "the evidence showing that [Ms.] Crain started taking mental health medication because of [Mr.] Kincaid negated a general inference that [she] had a mental defect that would cause her to fabricate the allegations."  However, Mr. Kincaid's defense, as it related to Ms. Crain's mental health, was not that the allegations stemmed from her underlying mental health condition. *Cf. Trujillo*, 953 P.2d at 1185.  In closing, defense counsel expressly said, "the bigger concern isn't so much [Ms. Crain's] mental health but . . . the number of medications that she was being prescribed for her mental health[.]"  The defense was that the allegations stemmed from either her use of the medications, together with marijuana, or sudden cessation of those medications.  *Trujillo* is thus distinguishable.

---

[4] Ms. Newsome had "[p]sychogenic pain disorder, a schizophreniform disorder, and schizoidal personality disorder," which could cause hallucinations, delusions, and disordered behavior. *Trujillo*, 953 P.2d at 1185 nn.1, 2.  Medication could prevent those symptoms, but Ms. Newsome's medical records reflected she had stopped taking medications during her pregnancy. *Id.* at 1185 n.2.  At trial, Mr. Trujillo contended the charges were based on Ms. Newsome's hallucinations, which stemmed from her psychological disorders. *Id.* at 1185.  He suggested that she was mentally unbalanced, and thus not credible, because she had stopped taking medication during pregnancy.  *Id.*

[¶41]   More importantly, even assuming the State could not anticipate the precise nature of Mr. Kincaid's attack on Ms. Crain's credibility, *Trujillo* does not stand for the proposition that the State may use unnoticed 404(b) evidence to rehabilitate a witness so long as it could not have anticipated the attack.  *See Trujillo*, 953 P.2d 1182.  That the prosecution in *Trujillo* knew, before trial, that Mr. Trujillo intended to use Ms. Newsome's medical records helped explain why the prosecution filed a motion in limine, *see id.* at 1185, but it was immaterial to our resolution of the 404(b) issue, *see id.* at 1185–86.  To interpret *Trujillo* as the State suggests would impermissibly weaken the protections of W.R.E. 404(b).  The Park City testimony was not admissible pursuant to *Trujillo*.

### 2. Open Door

[¶42]   The open door doctrine stands for the proposition that if a litigant introduces evidence on an otherwise irrelevant or inadmissible issue, he cannot complain when the opposing party introduces evidence on that same subject.  *Bonds v. State*, 2020 WY 61, ¶ 13, 463 P.3d 162, 165 (Wyo. 2020) (citing *Singer v. Lajaunie*, 2014 WY 159, ¶ 37, 339 P.3d 277, 287 (Wyo. 2014)).  The doctrine presumes "the evidence at issue is 'otherwise irrelevant or inadmissible.'"  *Id.* (quoting *Singer*, ¶ 37, 339 P.3d at 287); *see also* 1 Mueller & Kirkpatrick, *Federal Evidence* § 1:12 (4th ed.) (May 2021 Update) (explaining that, often, evidence admitted pursuant to an open door would otherwise be inadmissible because it violate rules on character evidence, is irrelevant, or is prejudicial).

[¶43]   There are limits to the open door doctrine.  For example, a prosecutor cannot "engage in overkill which is only moderately justified[.]"  *Bonds*, ¶ 15, 463 P.3d at 166 (quoting *Gayler v. State*, 957 P.2d 855, 859 (Wyo. 1998)).  And a prosecutor may not exceed the scope of an open door.  *Id.* (citing *Nelson v. State*, 2010 WY 159, ¶ 39, 245 P.3d 282, 292 (Wyo. 2010)).

[¶44]   The district court has discretion to admit evidence under the open door doctrine.  *Id.* (citation omitted).  In exercising its discretion, the court should consider "the degree of 'fit' between initial proof and counterproof, the importance of the issue at stake, and the balance of probative worth and prejudicial effect[.]"  *Id.* (quoting 1 Mueller & Kirkpatrick, *Federal Evidence* § 1:12 (4th ed.) (May 2020 Update)).

[¶45]   Mr. Kincaid's argument that the court abused its discretion centers on the degree of fit between cross and redirect, as well as the potential for prejudice.  He generally asserts that defense counsel's questions about Ms. Crain's medications and panic attacks were not enough to open the door to testimony about a prejudicial, highly similar, prior incident between him and Ms. Crain.  Conversely, the State maintains that evidence showing why Ms. Crain sought psychiatric treatment directly fit with the cross about her prescriptions; Ms. Crain's credibility was important; and the potential for prejudice was low because the court limited the testimony to a single incident and Ms. Crain never alleged "that [Mr.] Kincaid threatened any violence towards her" in Park City.

10

### Importance of the issue at stake

[¶46]   The State sought to introduce the Park City incident on redirect to explain why Ms. Crain was prescribed medications.  The overarching "issue at stake" was Ms. Crain's rehabilitation and, in that respect, we generally agree that it was important for the State to have the opportunity to rehabilitate Ms. Crain after cross-examination because, as the district court noted, "so much gives the impression that for some unknown reason, the witness is taking all of these medications, and [] it's confusing or difficult to understand why she would be doing that[.]"  But the particular details about what happened in Park City were not important to Ms. Crain's rehabilitation.

### The degree of "fit" between initial proof and counterproof

[¶47]   The main problem with the district court's admission of the Park City testimony under the open door doctrine lies in the degree of fit between cross and redirect.  We have explained that "[t]he open door doctrine does not pave the way for responsive evidence just because it fits in the same general category as evidence already admitted."  *Bonds*, ¶ 14, 463 P.3d at 166 (citation omitted) ("It [was] a stretch to conclude that general remarks about safety opened the door to testimony concerning which passengers were and were not wearing seatbelts."); *see also* 1 Mueller & Kirkpatrick, *Federal Evidence* § 1:12 (4th ed.) (May 2021 Update) ("The question in each case is not whether initial proof shares some common quality with proof offered in response.  Rather, it is whether the latter answers the former, and whether it does so in a reasonable way without sacrifice of other important values.").  Other courts have described the question as one of proportionality.  *United States v. Jett*, 908 F.3d 252, 271 (7th Cir. 2018) ("The gist of the [open-door] doctrine is proportionality and fairness.  When the opponent's response 'does not directly contradict the evidence previously received' or 'goes beyond the necessity of removing prejudice in the interest of fairness,' it should not be admitted." (citation omitted)); *State v. Nohava*, 2021 S.D. 34, ¶ 19, 960 N.W.2d 844, 851 ("[T]he evidence that comes through the open door must be proportional to the initial inquiry which provoked the need for a response or clarification.").

[¶48]   On cross, defense counsel asked Ms. Crain pointed, direct questions about Ms. Crain's prescriptions.  That questioning warranted an equally pointed, direct explanation that Ms. Crain was prescribed medications to treat depression, anxiety, panic attacks, and nightmares resulting from past trauma.  It did not warrant the lengthy, detailed, but indirect recitation of what happened in Park City.  *Cf. Bonds*, ¶ 16, 463 P.3d at 166 ("[T]he evidence offered in response to Mr. Bonds' testimony was brief and responded directly to his assertion that all but one passenger in the van were wearing seatbelts.").

11

**The balance of probative worth and prejudicial effect**

[¶49]   Moreover, the probative value of the Park City testimony was not great.  Most of Ms. Crain's testimony about Park City had nothing to do with the fact that she was prescribed medications to treat depression, anxiety, panic attacks, and nightmares resulting from past trauma.  She only loosely tied the incident to her decision to make an appointment to see a psychiatrist.

[¶50]   And, as more fully discussed in the next section, the potential for undue prejudice was great.  *Cf. id.* ("Although the evidence's probative value was not great, neither was its potential for undue prejudice, delay, or confusion.").  Similarities between the charged incident and the Park City incident tended to increase the risk that the jury would infer that if Mr. Kincaid did it before, he did it again.  *See Moser v. State*, 2018 WY 12, ¶ 22, 409 P.3d 1236, 1244 (Wyo. 2018) ("The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again." (citation omitted)).  In each incident, Mr. Kincaid was intoxicated; had a weapon; scared people to the point that the police or security had to be called; threatened to tell Ms. Crain's supervisor about her marijuana use; and mocked Ms. Crain.  Though Ms. Crain never testified that Mr. Kincaid physically threatened her in Park City, the jury could reasonably infer from her testimony that she did not feel safe with him that Saturday night.  She testified that, to keep Mr. Kincaid out of trouble with the police and military, she told police she would be fine staying with Mr. Kincaid; she suggested the police "take his guns and take his knife" before they left, which they did; and then she slept "[o]n the bathroom floor, with the door locked."

[¶51] Considering that the Park City details had little importance to Ms. Crain's rehabilitation, the degree of fit between the relevant portions of cross and redirect was off, the probative value of the Park City testimony was low, and the potential for prejudice was high, we conclude that the district court could not have reasonably concluded as it did.  The court abused its discretion by admitting Ms. Crain's Park City testimony under the open door doctrine.

### B. Prejudice

[¶52]   Because there was no proper basis to admit the Park City testimony, this case turns on whether the Park City testimony prejudiced Mr. Kincaid.  As noted above, Mr. Kincaid has the burden to prove there is a reasonable probability that the result would have been more favorable to him had the court not admitted the testimony.  *See Swett*, ¶ 42, 431 P.3d at 1146.

[¶53]   Mr. Kincaid argues the Park City testimony prejudiced him for several reasons.  First, the testimony "left a burning impression with the jury that [he] had been involved in an incident very similar to the charged offense, which [could] tend to increase the jury's

sense of need to punish [him] or protect the community." Second, the testimony emphasized that he "is a contemptible person with no regard for others." Third, the testimony "allow[ed] the jury to infer that because Mr. Kincaid had acted badly before, it would not be a far stretch to assume he had acted badly this time." Finally, the State went back to the Park City testimony in its closing and rebuttal.

[¶54] That the Park City incident cast Mr. Kincaid in a bad light is not our main concern because the jury heard plenty of independent admissible evidence casting him in a bad light. *See Blanchard*, ¶ 27, 468 P.3d at 694 (noting that, "[i]n terms of evidence[] that would make him appear morally disreputable, distasteful, and prone to acting offensively toward KW, it seem[ed] likely that the impact of the State's 404(b) evidence paled in comparison to" other testimony). The independent evidence reflected that Mr. Kincaid drank excessively; his demeanor when he drank was "creepy"; he previously threatened to tell Ms. Crain's supervisor about her marijuana use; he had numerous firearms; he used firearms to intimidate and control; the day before the incident, he was drunk, "chugging" alcohol, and eating "tons" of THC gummies; and he mocked and taunted Ms. Crain during the 911 call.

[¶55] Our main concerns relate to the strength of the State's evidence against Mr. Kincaid, the nature of the Park City testimony, and the manner in which the State used that testimony in closing and rebuttal. First, the evidence against Mr. Kincaid was not overwhelming. *Cf. Klingbeil v. State*, 2021 WY 89, ¶ 38 n.3, 492 P.3d 279, 287 n.3 (Wyo. 2021); *Broberg*, ¶ 20, 428 P.3d at 172. Second, the Park City testimony was not brief. *Cf. Broberg*, ¶ 20, 428 P.3d at 172. Third, due to similarities between the charged incident and Park City, *see supra* ¶ 50, there is a high likelihood that the jury drew the improper inference that if Mr. Kincaid did something similar before, he probably did it again. *See Moser*, ¶ 22, 409 P.3d at 1244.

[¶56] Finally, the State not only mentioned Park City in closing and rebuttal, *cf. Mitchell*, ¶ 29, 476 P.3d at 235; *Broberg*, ¶ 20, 428 P.3d at 172, the manner in which it did so heightened its prejudicial effect. In closing, the State highlighted the similarities between the two incidents to support Ms. Crain's version of events.

> On the [911] call, you heard a person who supposedly loves the woman who is frantically calling [911] because she's afraid. And what do you hear? You hear him mocking her. At one point, yeah, yeah, yeah, yeah, yeah, while she's having a panic attack? Find that odd? Find that strange behavior? If this didn't happen and she's having a panic attack on her own and it's a woman you love, wouldn't you try to console her? Would you say something along the lines, "I'm trying to calm you down. You're having a panic attack." Would you say that? No.

13

> Would you hold -- would you say something like, is this his name?  **You heard that on the [911] call.  And doesn't that correlate with what he was doing to her about blackmail?  He knew where to push her buttons.  He knew it upset her.  Absolutely.  He knew that was going to upset her, because they talked about it before, and he's done that before.**
>
> **You heard the testimony about Park City.  And he was showing it to her, and he was pushing buttons, and he was trying to make matters worse.  He wasn't filming her like he tried to do in Park City, but while she's on the phone, he's showing her, and you can hear his voice saying, "Is this the number"?**

(Emphasis added.)  Then, in rebuttal, the State highlighted that Park City was a "nasty situation" that left Ms. Crain "traumatized."

> [Defense counsel] starts off with the she's a liar because she had an affair.  She's a liar because she had an affair.  I think people would understand that that is deceitful if you're married and have an affair, **but you also have to remember they were separated in November after a pretty nasty situation in Park City that left her traumatized.**

(Emphasis added.)

[¶57]  Consequently, we conclude there is a reasonable probability that the result would have been more favorable to Mr. Kincaid if the Park City testimony had not been admitted.[5]

---

[5] The State suggests that we "should be hesitant to find prejudice" because Mr. Kincaid expressly declined the district court's offer to provide the jury a limiting instruction about the Park City testimony.  We will not weigh that decision against Mr. Kincaid, as it may have been strategic.  *See Medrano v. State*, 914 P.2d 804, 809 (Wyo. 1996) (noting that counsel may "conclud[e] that, as a matter of strategy, he is better off without an instruction than with one, in that an instruction would serve only to remind the jury of what it has heard or to re-emphasize the evidence in the minds of the jurors, and perhaps to suggest to the jury a use for the evidence which is best left unmentioned"); *Beintema v. State*, 936 P.2d 1221, 1228 (Wyo. 1997) ("Counsel may, as a matter of trial strategy, choose not to request a limiting instruction in order to avoid emphasizing the unfavorable evidence." (citation omitted)).  Moreover, even if a limiting instruction had been provided, it may not have cured the prejudicial impact of Ms. Crain's Park City testimony.  *See Swett*, ¶ 53, 431 P.3d at 1148 ("A limiting instruction is one factor we consider in determining whether there is a reasonable probability that the verdict would have been different if the erroneous evidence had not been admitted at trial.").

## *CONCLUSION*

[¶58]   The district court abused its discretion by admitting the Park City testimony and that testimony prejudiced Mr. Kincaid.  We therefore reverse and remand for a new trial.